[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11098

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 11, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-01594-CV-AR-W
BKCY No. 01-70115-CMS

IN RE: GLOBE MANUFACTURING CORP.,
     d.b.a. Globe Elastics Co., Inc.,

                                             Debtor.

_____

CARRIER CORPORATION,

                                             Plaintiff-Appellant-
                                             Cross-Appellee,

     versus

DENNIS J. BUCKLEY,
Litigation Trustee,

                                             Defendant-Appellee-
                                           Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(May 11, 2009)

Before MARCUS, ANDERSON and CUDAHY,[*] Circuit Judges.

CUDAHY, Circuit Judge:

Section 547(b) of the Bankruptcy Code authorizes a trustee to avoid certain property transfers made by a debtor within 90 days before bankruptcy. The Code makes an exception, however, for transfers made in the ordinary course of business.

In the present case, the bankruptcy trustee for Globe Holding and its subsidiary Globe Manufacturing (which we will refer to collectively as Globe), brought an action to recover payments made by Globe to Carrier Corporation, one of Globe's unsecured creditors, just prior to the filing of Globe's bankruptcy petition. Carrier argues both that these payments were not preferential and that the payments were not avoidable because they were made in the ordinary course of business. Following a trial, the bankruptcy court granted judgment for the trustee, but declined to award prejudgment interest. *In re Globe Holdings, Inc.*, 366 B.R. 186 (Bankr. N.D. Ala. 2007). The district court affirmed. We affirm as well.

I.

Prior to its dissolution, Globe manufactured spandex in its three textile plants,

_____

[*] Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

the oldest of which was located in Fall River, Massachusetts. About six months before it declared bankruptcy, Globe executed a contract for Carrier to install a commercial climate control system in its Fall River plant in exchange for approximately $ 1.25 million to be paid in six installments.

On January 13, 2001, Globe filed a voluntary Chapter 11 petition.[1] During the 90-day period prior to the filing of Globe's petition, Globe had made two payments totaling $ 615,831 to Carrier. These two payments were made an average of 28 days late under the terms of the contract. (The other installment payments–two of which were made well before the preference period, and two of which were made by a third party–are not at issue here.)

At the time of its bankruptcy petition, Globe owed approximately $146 million in senior secured debt. The Bankruptcy Court approved the sale of substantially all of Globe's assets to a competitor for approximately $52 million, $42 million of which was paid to the senior secured lenders, leaving them with a deficiency of over $100 million on their secured claims. Subsequently, Globe's trustee filed a complaint against Carrier pursuant to Section 547(b) to recover the two payments that were made within 90 days of Globe's bankruptcy petition.

---

[1] A month before its voluntary petition, certain junior lenders filed an involuntary Chapter 11 petition, which was dismissed when Globe filed its own voluntary petition.

II.

We review the district court's decision to affirm the bankruptcy court *de novo*, which allows us to access the bankruptcy court's judgment anew, employing the same standard of review the district court itself used. *See In re Issac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir. 2004); *In re Club Assoc.*, 951 F.2d 1223, 1228 (11th Cir. 1992). Thus, we review the bankruptcy court's factual findings for clear error, and its legal conclusions *de novo*. *In re Club Assoc.*, 951 F.2d at 1228-29.

Carrier argues that the payments the trustee seeks to recover were not preferential because Carrier would have been able to become a secured creditor if it had not been paid, and that the payments are not avoidable because they were made in the ordinary course of business. Neither of these arguments has merit.

A.

The Bankruptcy Code authorizes bankruptcy trustees to "avoid any transfer of an interest of the debtor in property" if five conditions are met. In brief, the trustee must show that the payment was (1) to the creditor, (2) on account of a previous debt, (3) made while the debtor was insolvent, (4) made 90 days before the bankruptcy petition was filed and (5) effective in enabling the creditor to receive more than it would have received had the debtor's estate been liquidated under Chapter 7. 11

4

U.S.C. § 547(b).[1]

Only the last of these conditions is relevant here: to avoid a transfer, the trustee must show that the transfer enabled the creditor to improve its position vis-à-vis other creditors. § 547(b)(5); *see generally Barash v. Pub. Fin. Corp.*, 658 F.2d 504, 509 (7th Cir. 1981) ("Section 547(b)(5) is directed at transfers which enable creditors to receive more than they would have received had the estate been liquidated and the disputed transfer not been made."). Carrier argues that the two payments Globe made approximately two months before it declared bankruptcy did not improve its position because it could have become a secured creditor by exercising its right to perfect a lien on Globe's Massachusetts textile plant. This argument is wide of the mark for two reasons.

First, and most obviously, while Carrier *could have* taken steps to become a secured creditor, it did not do so. By its terms, the parties' contract is governed by Massachusetts law, under which a lien exists only following a proper recording of

---

[1] The purpose of this provision is to provide assurance to unsecured creditors–who might otherwise feel the need to race to the courthouse to dismember the debtor to protect their interests–and to ensure that all creditors share equally. *See Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (citing H.R. Rep. No. 95-595, p.177-78 (1977), U.S.C.C.A.N. 1978, p. 6137-38); *see also In re Xonics Imaging, Inc.*, 837 F.2d 763, 765 (7th Cir. 1988) ("If there were no rule against preferences, an insolvent debtor, teetering on the edge of bankruptcy and besieged by creditors, might have an incentive to buy off the most importunate of his creditors, necessarily at the expense (the debtor being insolvent) of other creditors, in the hope of keeping afloat a little longer. Knowing that the debtor might do such a thing, an unsecured creditor who sensed that a debtor might be about to go belly-up would have a strong incentive to petition him into bankruptcy so that the debtor could not deplete the assets available to pay this creditor by paying another unsecured creditor instead.").

notice of the parties' contract. *See Tremont Tower Condo., LLC v. George B.H. Macomber Co.*, 767 N.E. 2d 20, 23 (Mass. 2002); *see also Admiral Drywall, Inc. v. Cullen*, 56 F.3d 4 (1st Cir. 1995) (noting that Massachusetts law does not recognize the existence of an equitable mechanic's lien). Thus, while a contractor "has a statutory right to ... a lien ... the lien itself does not exist until the contractor does something to assert that right." *Tremont*, 767 N.E. 2d at 25. In the present case, Carrier admits that it took no steps to assert its right to a lien, stating that it "saw no need." (Carrier Reply at 2.) This admission vitiates its claim that Globe's payments immediately prior to its bankruptcy petition did not improve Carrier's position relative to other creditors.[2]

A second problem with Carrier's argument is that even if it *had* perfected a lien against Globe's Massachusetts plant, there would have been no equity to which the lien could attach. Under Massachusetts law, a mechanic's lien is subordinate to a duly registered mortgage. Mass. Gen. Laws ch. 254, § 7(a). In the present case, the sale of

---

[2] Carrier also argues that the payments are not avoidable because the Bankruptcy Code provides that a Trustee may not avoid payments that "fix[] ... a statutory lien." 11 U.S.C. § 547(c)(6). Carrier's argument is briefed in the most cursory fashion, and is therefore waived. *See, e.g., Tallahassee Memorial Regional Medical Center v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987). At any rate, the argument also lacks merit. Again, Carrier was *not* a statutory lienholder. Carrier appears to rely on *Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1010 (N.D. Tex. 1987), as authority for the proposition that federal bankruptcy law relieves it of the need to comply with state statutory procedures for perfecting its liens. (We say "appears" because, again, its brief is far from pellucid.) For the sake of completeness, therefore, we note that the Fifth Circuit has rejected *Cimmaron*'s interpretation of Section 547(c)(6). *See In re Ramba, Inc.*, 416 F.3d 394, 401 (5th Cir. 2005). Were this issue properly raised, we would be inclined to reject this aspect of *Cimmaron* as well.

Globe's assets left Globe's senior secured lenders with a deficiency of over $100 million on their secured claims. Thus, there is no merit to Carrier's suggestion that it would have been paid in full even if the preferential payments had not been made.

B.

Carrier's argument that Globe's payments, even if preferential, are not avoidable because they were made in the ordinary course of business is somewhat more compelling, but also ultimately unavailing.

The version of the Code that was in effect at the time this action was commenced provided that a trustee may not avoid a payment on a debt that was incurred in the ordinary course of business, paid in the ordinary course of business and paid in accordance with ordinary business terms. Pub. L. No. 95-598, 11 U.S.C. former § 547(c)(2), 92 Stat. 2549, 2598 (1978) (amended 2005).[3] The legislative history explains that section 547(c)(2) is intended to encourage normal credit transactions and the continuation of short-term credit dealings with troubled debtors so as to postpone, rather than hasten, bankruptcy to the extent that this result does not

---

[3] The 2005 amendments to the Bankruptcy Code modified 547(c)(2). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, April 20, 2005, 119 Stat 23. Prior to 2005, to establish an "ordinary course" defense, a creditor had to show *both* that the transfer was made in the ordinary course and according to ordinary terms. The 2005 amendment allows a creditor to prevail by showing *either* that the course or the terms were ordinary. Since this case was commenced prior to the October 17, 2005, the effective date of the amendments, we apply the prior statute and the case law interpreting it.

detract from the policy of the preference section of discouraging unusual action by either the debtor or its creditors during the debtor's slide into bankruptcy. S. Rep. No. 95-989, at 88, *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5874; *see also In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 848 (7th Cir. 1997) ("The exceptions in § 547(c) identify cases where there is little risk that the pre-bankruptcy payments will give rise to [a] race [to get one's debt repaid] and to the concomitant costly self-protection.").

The phrases "ordinary course of business" and "ordinary business terms" are not defined by the Code. Courts have interpreted the "ordinary course of business" requirement to be subjective in nature insofar as it requires courts to consider whether the transfer was ordinary in relation to the "other business dealings between *that* creditor and *that* debtor." *In re Fred Hawes Org., Inc.*, 957 F.2d 239, 244 (6th Cir. 1992); *see also In re Issac Leaseco*, 389 F.3d at 1210; *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223-28 (3d Cir. 1994). The "ordinary business terms" requirement, by contrast, is objective in nature, requiring proof that the payment is ordinary in relation to prevailing industry standards. *See In re Issac Leaseco*, 389 F.3d at 1210; *see also Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 & n.3 (4th Cir. 1994) (citing cases interpreting the "ordinary terms" requirement). The creditor has the burden of proof with respect to both requirements. 11 U.S.C. §

547(g); *In re Issac Leaseco*, 389 F.3d at 1210.

The fact that the payments at issue here were not only preferential within the meaning of § 547(b) but also *late* makes it difficult to show that they were made in the "ordinary course of business." "[U]ntimely payments are more likely to be considered outside the ordinary course of business and avoidable as preferences." *In re Craig Oil*, 785 F.2d 1563, 1567-68 (11th Cir. 1986); *see also In re Fred Hawes*, 957 F.2d at 244. As Judge Posner has explained,

> It may seem odd that paying a debt late would ever be regarded as a preference to the creditor thus paid belatedly. But it is all relative. A debtor who has entered the preference period—who is therefore only 90 days, or fewer, away from plunging into bankruptcy—is typically unable to pay all his outstanding debts in full as they come due. If he pays one and not the others ... the payment though late is still a preference to that creditor ... The purpose of the preference statute is to prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors, who may sometimes be those who have been waiting longest to be paid.

*In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993) (Posner, J.); *see also In re Issac Leaseco*, 389 F.3d at 1212 ("A creditor who tolerates unusual delays in payment from a debtor on the verge of bankruptcy may be dependent on the debtor and aiding the debtor in forestalling the inevitable to the detriment of less dependent creditors.").

Of course, the fact that a payment is late does not necessarily show that the payment was unusual from the debtor's perspective. To the contrary, a creditor may present evidence to rebut the presumption that a particular late payment was out of the ordinary. In the present case, however, there was no evidence that the parties had dealt with each other *at all* before they executed the contract under which Globe made the preferential payments. Where parties have no extensive history of credit transactions to which a disputed payment can be related, their express agreement furnishes "the most informative evidence left to consider" of the ordinariness of a transaction from the parties' perspective. *In re Fred Hawes*, 957 F.2d at 245. Here, the contract called for payment 30 days from the date of the invoice, and Globe's payments were approximately one month late on average. While Globe's two other payments to Carrier were also late, we cannot say, based on this record, that this is enough to prove that the late payments were ordinary from the parties' perspective.

Even assuming that Carrier had shown that Globe's preferential payments were made in the "ordinary course of business," it has not shown that these payments were made according to "ordinary business terms." There are at least two purposes for the "ordinary terms" requirement. The first purpose is evidentiary: if a creditor testifies that it dealt with the debtor on terms that are wholly unknown in the industry, then the evidence of industry norms casts some doubt on the creditor's testimony. The

second purpose is to obviate the risk that certain creditors may work out a special deal to be paid ahead of the others in the event of bankruptcy. *See In re Tolona Pizza*, 3 F.3d at 1032.

To satisfy the "ordinary terms" requirement, the creditor must characterize the payment practices of its industry with specificity, and present specific data to support its characterization. *See Advo-Sys.*, 37 F.3d at 1050-51; *see also In re U.S. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. 2005) (creditor's characterization of industry norm must be "supported by specific data"); *In re Merry-Go-Round Enters., Inc.*, 272 B.R. 140, 148 (Bankr. D. Md. 2000) (specificity is particularly important because it is to be expected that the creditor's expert's testimony would be favorable to the creditor's position). This is particularly true where the parties have not dealt extensively with one another in the past. Where, as here, "the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry." *In re Molded Acoustical Prods.*, 18 F.3d at 225; *see also In re Issac Leaseco*, 389 F.3d at 1211 (where the parties' business relationship lasted only six months, "the bankruptcy court had no choice but to evaluate their dealings strictly according to industry standards.").

In the present case, Carrier neither characterized industry payment practices with adequate specificity, nor did it offer specific evidence in support of its characterization of industry norms. Carrier presented testimony from two witnesses, neither of whom had much to say about payment norms within the industry. The first witness, Christopher O'Connor, was a Carrier regional manager who oversaw the Globe installation project. O'Connor admitted that he was not responsible for issuing invoices and processing payments, and had nothing at all to say about how Carrier's practices compared with industry norms. (Indeed, Carrier's counsel objected when Globe attempted to elicit such information from O'Connor on cross-examination.)

The second witness, David Witham, was an engineer who had worked as a consultant on the Globe installation project. Witham was ostensibly called as an expert on industry payment practices. However, he admitted that he was not involved in sending out invoices or processing payments, that he did not know when invoices were actually paid, and that he would become aware of payment issues only when someone told him that there was a problem. Thus, while Witham testified that the payments at issue here were not unusual for the industry, his own testimony undermined the basis for this conclusion.

To prevail on its "ordinary course" defense, the burden is on Carrier to prove that the payments in question were in accord with industry norms. Indeed, because

there was no evidence of the parties' past dealings, Carrier's burden is particularly

heavy: its evidence of industry norms must be sufficiently specific to enable the court

to undertake a "rigorous comparison" between the circumstances surrounding the

payments the trustee seeks to recover and the normal credit terms in the relevant

industry. *In re Molded Acoustical Prods.*, 18 F.3d at 225. Here, Carrier presented

nothing but the bottom line conclusion of a witness who admits that he has no real

familiarity with industry payment practices.

Carrier argues that the bankruptcy court was required to credit this conclusion

because the Trustee did not put on any witnesses to rebut Witham's testimony. This

argument is quite clearly unsupported.[4] It was Carrier's burden to present specific

evidence of industry payment practices. Though his testimony was unrebutted,

Witham was capable only of vague characterizations of the industry and its payment

practices. The bankruptcy court held that this is not enough to satisfy Carrier's

burden, and we agree.


III.

We also find that the bankruptcy court's decision not to award prejudgment

---

[4] Indeed, notwithstanding Carrier's protests to the contrary, it is far from clear from the transcript that the bankruptcy court actually certified Witham as an expert.

interest was reasonable. No provision of the Bankruptcy Code prescribes that the estate may recover prejudgment interest in an action to avoid a preferential transfer. 5 Collier on Bankruptcy ¶ 550.02[3][b] (15th ed. rev. 2007). However, courts have the discretion to award such interest as a matter of federal common law. *See In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 579-80 (3rd Cir. 2007); *In re Milwaukee Cheese Wisconsin*, 112 F.3d at 849; *In re Cybermech, Inc.*, 13 F.3d 818, 822 (4th Cir. 1994); *In re Inv. Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir. 1993).

While a bankruptcy court has the discretion to award prejudgment interest, we cannot say the court abused its discretion by declining to do so in this case. An award of prejudgment interest must be equitable. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987). Here, the bankruptcy court found that Carrier's position was reasonable, that the parties' dispute was genuine and that there was no evidence that either party was responsible for delaying the dispute's resolution.

The equitable basis for the bankruptcy court's denial of prejudgment interest is in tension with the rule that the Seventh Circuit, for example, has apparently adopted. According the Seventh Circuit rule, interest must be awarded in the ordinary case, and only considerations such as delay by the trustee can be a basis for declining to award interest. *See In re Milwaukee Cheese Wisconsin*, 112 F.3d at 849. The *Milwaukee Cheese* rule is based on the proposition that because of the time-value of

14

money, prejudgment interest is necessary to make the trustee whole. This is indisputable, as far as it goes, but the resulting rule seems inflexible. To say that a bankruptcy court has discretion to award interest is to say that it has a choice. 1 H. Hart & A. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 162 (Tent. Ed. 1958) ("Discretion" is "the power to choose between two or more courses of action each of which is thought of as permissible."); *see also Macklin v. Singletary*, 24 F.3d 1307, 1311 (11th Cir. 1994) ("under the abuse of discretion standard of review, there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call.") (internal quotation marks omitted). We believe that a standard of reasonableness is preferable to a more inflexible rule. Since Carrier's ordinary course defense fails primarily for evidentiary reasons, we cannot say that the court's decision not to award prejudgment interest was an unreasonable use of its equitable powers.

IV.

The district court affirmed the bankruptcy court's judgment in its entirety. We are also persuaded that the bankruptcy court was right to conclude that the Trustee is entitled to avoid Globe's preferential payments to Carrier, and that the court did not abuse its discretion by declining to award prejudgment interest. The judgment of the

15

district court affirming the bankruptcy court is, therefore,

**AFFIRMED.**