[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12021
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 30, 2011
JOHN LEY
CLERK

D.C. Docket No. 8:10-cv-01125-JDW, 8:08-bk-19499-CPM


IN RE: UNITED TILE & STONE, INC.,

Debtor.

_____

SOUTHEASTERN COMMERCIAL FINANCE, LLC,
an Alabama corporation,

Plaintiff - Appellant,

DOMINION BUSINESS FINANCE LLC,
consolidated,

Plaintiffs,

versus

FIRST COMMUNITY BANK OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 30, 2011)

Before EDMONDSON, CARNES, and FAY, Circuit Judges.

PER CURIAM:

Southeastern Commercial Finance, LLC purchased a portfolio of loans from Dominion Business Finance LLC. One loan in that portfolio was made to United Tile & Stone, Inc.[1] That loan was secured in part by mortgages on two pieces of United Tile's real property—one in Tampa, Florida, and one in Sarasota County, Florida. At the time Dominion acquired and recorded those mortgages, the Tampa and Sarasota properties were subject to recorded mortgages held by First Community Bank of America. Dominion had, however, entered into a subordination agreement with First Community providing that Dominion's mortgages on the Tampa and Sarasota properties would be ahead of First Community's mortgages on those properties in the mortgage chain. This case arises from a dispute about the scope of subordination provided for in that agreement.

I.

_____

[1] Dominion actually made the loan to two entities—United Tile and Valencia Stone, LLC—but the distinction between those entities does not matter in this case so we will refer to them collectively as "United Tile."

A.

In June 2006 First Community made two loans to United Tile, which were secured by a first-position lien on United Tile's personal property—its inventory, accounts receivable, and equipment—and a first-position mortgage on United Tile's Tampa property. When United Tile experienced financial difficulty, Siede Kamide, president of First Community's Tampa Region, contacted Jeff Mitchell, Dominion's president. They discussed Dominion providing $600,000 in asset-based financing to United Tile to facilitate a loan consolidation and an extension of additional credit to United Tile by First Community. The two presidents also discussed the possibility of First Community subordinating its lien on United Tile's personal property to Dominion's potential lien on that property.

Dominion conducted due diligence and prepared a credit approval request. That request indicated that Dominion would have a first-position lien on United Tile's personal property and that United Tile's other assets would serve as collateral subject to existing liens. Dominion then agreed to provide United Tile with a $600,000 line of credit, secured by a lien on United Tile's personal property if First Community would execute the previously discussed subordination agreement. First Community then closed on its loan consolidation and extension of additional financing to United Tile and took and recorded a second-position mortgage on the

Sarasota property.

After reviewing and revising drafts, Dominion and First Community executed a subordination agreement. The text of that agreement provides for complete subordination—all of First Community's then- or thereafter-existing liens on United Tile's property, including any mortgages on United Tile's real estate, were subordinated to any then- or thereafter-existing Dominion lien on United Tile's property. Dominion then closed on its loan to United Tile and took a mortgage on the Sarasota property on November 14, 2006. Dominion recorded that mortgage, placing it in third position behind another lender and First Community.

Six months later Dominion prepared a client visit report summarizing its exposure on its United Tile loan. That report expressly acknowledges that Dominion's mortgage on the Sarasota property is a third-position mortgage and indicates that Dominion has a first-position lien on United Tile's personal property. It does not, however, suggest that First Community subordinated its mortgage on the Sarasota property. Soon thereafter, Dominion obtained a mortgage on the Tampa property as part of a forbearance agreement with United Tile after United Tile defaulted on its loan. Dominion recorded that mortgage, placing it in second position behind First Community's mortgage on the Tampa property.

Dominion sold a portfolio of loans, which included its United Tile loan, to

4

Southeastern in May 2008. Before closing on the transaction, Southeastern conducted due diligence. Dominion made all of its loan files available to Southeastern, including correspondence, field reports, and credit approval requests. Southeastern's due diligence culminated in a memorandum prepared by Patrick Trammel, its president. That memorandum explicitly noted that Dominion had second- and third-position mortgages on the Tampa and Sarasota properties, respectively, and it gave Dominion's United Tile loan a poor rating. Nonetheless, on May 30, 2008, Southeastern and Dominion executed an agreement under which Southeastern agreed to purchase Dominion's loan portfolio, including the United Tile loan.

B.

In October 2008 First Community sued Southeastern, Dominion, and United Tile in Florida state court seeking, among other things, reformation of the subordination agreement to reflect that First Community and Dominion had made a mutual mistake by providing for complete subordination instead of subordinating only First Community's lien on United Tile's personal property. When United Tile filed for reorganization under Chapter 11 of the Bankruptcy Code, the bankruptcy court removed First Community's state court suit and docketed it as an adversary proceeding.

5

After holding a trial, the bankruptcy court found that Dominion and First Community had made a mutual mistake in their subordination agreement by providing for complete subordination instead of subordinating only First Community's lien on United Tile's personal property. The bankruptcy court reformed the subordination agreement to reflect that First Community retained a first-position mortgage on the Tampa property and a mortgage on the Sarasota property in a position that was ahead of Dominion's mortgage on that property. The bankruptcy court also found that Southeastern was not a bona fide purchaser without notice because Southeastern had "implied actual notice" of the mutual mistake. The court thus ruled that Southeastern's mortgages on the Tampa and Sarasota properties were subject to the reformed subordination agreement.

Southeastern and Dominion appealed to the district court, which affirmed the bankruptcy court's decision, concluding that substantial evidence supports the bankruptcy court's findings. Southeastern then filed this appeal, and it makes three contentions: that clear and convincing evidence did not establish that First Community and Dominion made a mutual mistake warranting reformation; that First Community's gross negligence precluded reformation; and that Southeastern should take Dominion's loan to United Tile subject to the unreformed subordination agreement because Southeastern was a bona fide purchaser without notice of the

6

mutual mistake.

## II.

We review de novo a district court's decision to affirm the bankruptcy court, employing the same standard of review that the district court itself used. In re Globe Mfg. Corp., 567 F.3d 1291, 1296 (11th Cir. 2009). We thus review de novo the bankruptcy court's legal conclusions and review for clear error its findings of fact. See id. Under the clear error standard, "we may reverse the [the bankruptcy court's] findings of fact if, after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1319–20 (11th Cir. 2011) (quotation marks omitted). But if the record shows that substantial evidence supports the bankruptcy court's findings of fact, the court did not commit clear error. See Johnson v. Hamrick, 296 F.3d 1065, 1074 (11th Cir. 2002).

## III.

Southeastern contends that clear and convincing evidence did not establish that First Community and Dominion made a mutual mistake warranting reformation. Under Florida law,[2] "[a] court of equity has the power to reform a written instrument

---

[2] The executed subordination agreement provides that it is governed by, and should be construed and enforced according to, Florida law.

7

where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument." Providence Square Ass'n, Inc. v. Biancardi, 507 So. 2d 1366, 1369 (Fla. 1987). "[R]eformation only corrects the defective written instrument so that it accurately reflects the true terms of the agreement actually reached." Id. at 1370. "A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument." Id. at 1372. "[T]he party seeking reformation based on a mutual mistake must prove its case by clear and convincing evidence." BrandsMart U.S.A. of W. Palm Beach, Inc. v. DR Lakes, Inc., 901 So. 2d 1004, 1006 (Fla. 4th DCA 2005).

We agree with the district court that substantial evidence supports the bankruptcy court's finding that First Community and Dominion made a mutual mistake by executing a subordination agreement providing for complete subordination. Kamide testified that before executing the agreement, he and Mitchell had discussed subordinating only First Community's lien on United Tile's personal property. He also testified that First Community found Dominion's first draft of the agreement unacceptable because it provided for complete subordination. According to Kamide, Harold Combs—a senior credit officer at Dominion—agreed that the first draft was incorrect and promised to send a revised draft. Kamide found that revised

draft to be "substantially correct" because it only "reflected a subordination of a lien on" United Tile's personal property. He believed that the revised draft represented an agreement between First Community and Dominion on the limited scope of subordination. However, when Dominion sent Joy Zalkin—a First Community senior vice president with authority to execute the subordination agreement—a signed version of the subordination agreement, Zalkin executed that agreement without reading it or submitting it to counsel for review as First Community protocol required. That executed agreement provides for complete subordination and is almost identical to the first draft that First Community found unacceptable.

Dominion's conduct before and after executing the subordination agreement also supports the bankruptcy court's finding. Dominion prepared documents indicating that its lien on United Tile's personal property was superior to First Community's lien but that its mortgages on United Tile's real estate were inferior to First Community's mortgages on that real estate. Those documents include the credit approval request, the client visit report, and an internal memorandum concluding that, due to business conditions at United Tile, Dominion's loan had "chang[ed] from being a predominantly accounts receivable revolving facility into one collateralized mainly by inventory, equipment and 2nd and 3rd positions" (emphasis added) on United Tile's real estate. Further, Dominion's attorneys prepared—and United Tile

9

executed and recorded—a notice of limitation of future advances that limited the amount of principal that could be secured by First Community's mortgage on the Tampa property. That limitation would have been superfluous if First Community had subordinated its mortgage on the Tampa property: if Dominion had foreclosed on its United Tile loan and sold the Tampa property, Dominion would have been paid in full before First Community was paid anything, regardless of the principal secured by First Community's mortgage.

Dominion's conduct during its negotiations with Southeastern provides more support for the bankruptcy court's finding of mutual mistake. Trammel's due diligence memorandum not only criticized Dominion's United Tile loan but also insisted on a hold-back provision in which $300,000 of Southeastern's payment for Dominion's loan portfolio would be placed in escrow to offset potential losses on the United Tile loan. Trammel sent a copy of that memorandum to Dominion's board of directors, and after reviewing it, one of the directors sent an email to Mitchell criticizing his management and accusing him of misrepresenting the loan portfolio's income. No evidence in the record indicates that Mitchell challenged Southeastern on its analysis of the United Tile loan or defended himself to the Dominion board by asserting that Dominion's mortgages on the Tampa and Sarasota properties were superior to those of First Community. Moreover, Dominion agreed to the $300,000

10

hold-back provision, and no evidence in the record demonstrates that anyone at Dominion resisted that provision by arguing that Dominion's mortgages on the Tampa and Sarasota properties were superior to those of First Community.

IV.

Southeastern also contends that the bankruptcy court erred in reforming the subordination agreement because First Community committed gross negligence by failing to read the executed subordination agreement, follow protocol, or correspond with counsel. "A plaintiff's gross negligence . . . will prevent him from obtaining reformation . . . ." Goodall v. Whispering Woods Ctr., L.L.C., 990 So. 2d 695, 701 (Fla. 4th DCA 2008).

The bankruptcy court did not explicitly find that First Community did not commit gross negligence. Because a finding that First Community had committed gross negligence would have precluded reformation, however, we will infer that the bankruptcy court found that First Community was not grossly negligent. See United States v. $242,484.00, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) ("When inferring findings consistent with the district court's judgment, we are not engaging in factfinding ourselves. Instead, we are making the common sense judgment that material factual issues were resolved by the district court in favor of the judgment when it was reasonable for that court to do so in light of the evidence.").

11

We agree with the district court that substantial evidence in the record supports the bankruptcy court's implicit finding that First Community did not commit gross negligence. Although Zalkin signed the subordination agreement without reading it or submitting it to counsel for review, she testified that she probably felt comfortable doing so because she believed that the subordination agreement provided for the subordination of only First Community's lien on United Tile's personal property. Her belief was based on her earlier conversations with Combs and on the revised draft that Kamide believed was "substantially correct." The record also establishes that First Community and Dominion had reviewed earlier drafts, made revisions, and agreed on a limited scope of subordination before Zalkin executed the agreement.

V.

Finally, Southeastern contends that the bankruptcy court erred in ruling that Southeastern had implied actual notice of the mutual mistake. "Reformation is generally allowed against all persons except a bona fide purchaser for value without notice." Fla. Masters Packing, Inc., v. Craig, 739 So. 2d 1288, 1290 (Fla. 4th DCA 1999). The "[n]otice sufficient to eliminate the transferee as a bona fide purchaser for value without notice can be either actual or constructive." Id. (quotation marks omitted). According to the Florida Supreme Court:

"Actual notice" is . . . said to be of two kinds: (1) Express, which

includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or as it is sometimes called, "implied actual notice."

Sapp v. Warner, 141 So. 124, 127 (Fla. 1932). Implied actual notice is thus present when a party has knowledge of enough facts that would cause a prudent person to make further inquiry. See McCausland v. Davis, 204 So. 2d 334, 335 (Fla. 2nd DCA 1967). "The principle . . . of alleged implied actual notice is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice." Fla. Masters Packing, 739 So. 2d at 1291.

We agree with the district court that substantial evidence supports the bankruptcy court's finding that a prudent man in Trammel's position would have made a further inquiry into the relative position of Dominion's mortgages on the Tampa and Sarasota properties after reviewing the executed subordination agreement, and therefore Southeastern had implied actual notice of the mutual mistake. Southeastern performed due diligence in which it had access to Dominion's loan files, and Trammel prepared a due diligence memorandum that gave the United Tile loan a low rating. That memorandum also insisted on the $300,000 hold-back provision. Trammel testified that he reviewed the executed subordination agreement after preparing and distributing that memorandum but before Southeastern closed on the

13

transaction. According to Trammel, the executed subordination agreement made the United Tile loan less risky than portrayed in his due diligence memorandum. But he never discussed the executed subordination agreement with anyone at Dominion, and after he emailed his due diligence memorandum to Mitchell and the Dominion board, neither Mitchell nor anyone else at Dominion challenged him on that memorandum's analysis of the United Tile loan despite the existence of the executed subordination agreement that made the loan less risky than portrayed in the memorandum. The bankruptcy court did not clearly err in finding that Southeastern had implied actual notice of the mutual mistake.

**AFFIRMED**.