[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11450
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cv-20635-KAM,
BKCY No. 07-21016-LMI

In Re: SUNDALE, LTD., f.k.a. Sundale Associates, Ltd.,

Debtor.
_____

SUNDALE, LTD.,
KENDALL HOTEL AND SUITES, LTD.,

Plaintiffs - Appellants,

versus

FLORIDA ASSOCIATES CAPITAL ENTERPRISES, LLC,

Defendant - Appellee,
_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(November 29, 2012)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

PER CURIAM:

Appellants Sundale, LTD ("Sundale") and Kendall Hotel and Suites, LLC ("KHS") (collectively, "Sundale") appeal from the district court's judgment upholding the bankruptcy court's finding of fact and conclusions of law in support of a final judgment in favor of Plaintiff/Counterdefendant Florida Associates Capital Enterprises, LLC ("FACE").  In Sundale's bankruptcy proceedings, FACE sought a declaratory judgment regarding the extent, validity and priority of the claims it had that stemmed from secured loans it had made to Sundale; in response, Sundale asserted various affirmative defenses and filed counterclaims against FACE, including a claim of recoupment of more than three million dollars in payments Sundale had made to FACE concerning the secured loans.  In this appeal, Sundale argues that: (1) the district court erred in concluding that the bankruptcy court had jurisdiction over Sundale's counterclaims; (2) the district court's review of the bankruptcy proceedings did not cure the bankruptcy court's unconstitutional exercise of jurisdiction; and (3) the bankruptcy court misapplied Florida law in ruling on the merits.  After careful review, we affirm.

We review subject matter jurisdiction de novo.  Adventure Outdoors, Inc. v. Bloomberg, 552 F.3d 1290, 1294 (11th Cir. 2008).  We review "the district court's decision to affirm the bankruptcy court de novo, which allows us to assess the bankruptcy court's judgment anew, employing the same standard of review the

2

district court itself used." In re Globe Mfg. Corp., 567 F.3d 1291, 1296 (11th Cir. 2009). The bankruptcy court's factual findings are reviewed for clear error. Id. Factual findings are clearly erroneous if "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." Jones v. Childers, 18 F.3d 899, 904 (11th Cir. 1994) (quotation omitted). "Conclusions of law, whether from the bankruptcy court or the district court, are reviewed de novo." In re Jennings, 670 F.3d 1329, 1332 (11th Cir. 2012) (quotation omitted). Mixed questions of law and fact are also reviewed de novo. In re Piper Aircraft Corp., 244 F.3d 1289, 1295 n.2 (11th Cir. 2001).

The relevant facts are these. Phillip Scutieri, Jr. ("Mr. Scutieri") is the principal of both Sundale and KHS. Raymond G. Chambers ("Mr. Chambers"), a successful businessman involved in leveraged buyouts in the 1980s, had a very close personal and professional relationship with the Scutieri family for over forty years.

On November 20, 1997, Mr. Scutieri's mother, Delphine Scutieri ("Mrs. Scutieri"), advised her son that she believed that Mr. Chambers had taken certain assets from her husband's estate to begin Chambers's leveraged buyout business. After Mrs. Scutieri's suspicions were relayed to Mr. Chambers, Mr. Chambers sent a letter to Mrs. Scutieri in which he promised to "share everything" with Mrs.

3

Scutieri. Over the next five months, representatives from the two parties attempted to resolve the dispute between them, and eventually Mr. Scutieri relayed that the Scutieris would require $420,000,000 to resolve the dispute.

Thereafter, Mrs. Scutieri apparently asked Mr. Chambers to give $10 million to her son to develop a nine-acre tract of land in Miami, Florida owned by Sundale (the "Sundale Property"), with the remaining amount due (approximately $410,000,000) to be worked out. According to Mr. Chambers, he said he would not loan the $10,000,000, but that he would tell his "financial advisors that they, (A), help [Mr. Scutieri] get a conventional first mortgage loan on the [Sundale Property] and, (B), if that loan fell short of the $10,000,000, that [Chambers] would recommend to them that [Chambers's] entities provide up to $2 million in a subordinated second mortgage loan." A witness to a meeting between the parties testified otherwise, attesting that Mr. Chambers promised to give $10,000,000 as an "initial payment of getting the monies back to [Mrs. Scutieri]." Shortly after this meeting, Mr. Chambers's representatives created FACE, the sole purpose of which was to provide funding for Mr. Scutieri's Sundale project.

Between July 30, 1999, and March 20, 2000, FACE (and/or its members) loaned Sundale a total of $7,300,000, through various promissory notes, personal guarantees, and mortgage and security agreements. On September 7, 2001,

4

Sundale closed a $12,000,000 loan with Ocean Bank for the Sundale project (the "Ocean Bank Loan"). The terms of the agreement provided for FACE's loans to be reduced to $3,250,000, and for FACE to subordinate its lien to the lien of Ocean Bank with respect to the remaining indebtedness. Sundale was obligated to make quarterly interest payments until November 29, 2002, and then monthly payments thereafter. Sundale made all interest payments due to FACE through May 2005.

On December 11, 2007, both Ocean Bank and FACE sent default notices to Sundale. The next day, Sundale filed for protection under Chapter 11 of the United States Bankruptcy Code, and KHS did the same on January 30, 2008. On May 1, 2008, FACE initiated this adversary proceeding by filing a two-count complaint seeking a determination of the extent, validity, and priority of its asserted lien on the Sundale Property. On November 17, 2008, Sundale and KHS responded by denying FACE's allegations and asserting a number of affirmative defenses. On July 30, 2009, Sundale and KHS filed a Second Amended Answer, for the first time asserting two counterclaims, one seeking a declaration that FACE's liens were not valid and enforceable and one for recoupment.

Both Sundale's affirmative defenses and counterclaims relied upon the same factual and legal bases, namely that FACE's lien was invalid and unenforceable

5

because the funds advanced by FACE were intended to be a disguised loan as an initial payment by Mr. Chambers to the Scutieri family as partial payment of the monies Mr. Chambers wrongfully diverted from the estate of Mr. Scutieri's father. The Bankruptcy Court ultimately ruled in favor of FACE, finding that FACE "overwhelmingly established a prima facie case that it holds a valid, perfected lien against the Sundale Property and the Trustee Property. Conversely, the Defendants failed to meet their burden of proof in every aspect with regard to their affirmative defenses and their counterclaims." The district court affirmed the bankruptcy court's determination of the extent, validity and priority of FACE's claims against Sundale, and it also held -- following the Supreme Court's recent decision in Stern v. Marshall, 131 S.Ct. 2594 (2011) -- that the bankruptcy court had the authority to rule on these claims. The district court noted, in the alternative, that if the bankruptcy court had exceeded its authority to enter a final judgment, it was treating the bankruptcy court's findings of fact and conclusions of law as a report and recommendation, which the district court adopted and ratified. This timely appeal follows.

First, we are unpersuaded by Sundale's claim that the bankruptcy court lacked jurisdiction to enter final judgment on its counterclaims. Congress has divided bankruptcy proceedings into three categories: (1) those that arise under

6

title 11; (2) those that arise in a title 11 case; and (3) those that are related to a case under title 11. Stern, 131 S.Ct. at 2603 (citing 28 U.S.C. § 157(a)). "District courts may refer any or all such proceedings to the bankruptcy judges of their district," and bankruptcy courts may "enter final judgments in 'all core proceedings arising under title 11, or arising in a case under title 11.'" Id. (quoting §§ 157(a), (b)(1)). Congress has chosen 16 specific types of proceedings that are considered to be "core proceedings" in which bankruptcy courts are statutorily authorized to render final judgments. See id. (citing §§ 157(b)(1)-(2)). Section 157(b)(2)(C) defines "counterclaims by the estate against persons filing claims against the estate" to be one of these "core proceedings." "Parties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards." Id. at 2603-04.

Stern involved a tortious interference counterclaim, arising under state common law, which the bankruptcy court had determined to be a "core proceeding" as defined by § 157(b)(2)(C). See id. at 2601-02. After determining it had jurisdiction over the matter, the bankruptcy court rendered a final judgment on the state law counterclaim. See id. at 2601. The Supreme Court determined that the bankruptcy court had the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on the state law counterclaim, but that it was a violation of

7

Article III of the United States Constitution for Congress to confer that authority upon the bankruptcy court. See id. The Supreme Court ultimately held that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." Id. at 2620. The Supreme Court also made clear that it did not intend its decision in Stern to have broad implications: "We do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one." Id.

As the district court explained, Stern is inapplicable here. That case involved a tortious interference counterclaim that was a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." Id. at 2611. The complaint in Stern was filed by a creditor seeking a declaration that his defamation claim was not dischargeable in the bankruptcy proceedings. Id. at 2601. The "proof of claim" at issue was "for the defamation action, meaning that [the creditor] sought to recover damages for [the claim] from [the] bankruptcy estate." Id. The debtor "responded to [the creditor]'s initial complaint by asserting truth as a defense to

8

the alleged defamation and by filing a counterclaim for tortious interference." Id.

That counterclaim alleged that the creditor "had wrongfully prevented [the

debtor's husband] from taking the legal steps necessary to provide [the debtor]

with half his property." Id. The counterclaim for tortious interference was the

claim deemed by the Supreme Court to be a "state law action independent of the

federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's

proof of claim in bankruptcy." Id. at 2611.

Here, the state law counterclaim Sundale travels on in its brief is

recoupment -- and as the Florida state courts have explained, recoupment is "a

purely defensive matter springing from the same transaction as the plaintiffs'

cause of action, which is available only to reduce or satisfy a plaintiffs' claim . . . .

A recoupment defense is analogous to a compulsory counterclaim, in that both

'spring' from the same transaction as the plaintiff's cause of action." Kellogg v.

Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., 807 So. 2d 669, 670

n.2 (Fla. 4th Dist. Ct. App. 2001) (citing Metropolitan Cas. Ins. Co. of N.Y. v.

Walker, 9 So.2d 361, 362 (Fla. 1942)). Sundale argues to us that FACE's proof of

claim hinged on the money that Sundale had not paid FACE, whereas its

recoupment counterclaim hinged on the money that Sundale had paid to FACE.

Sundale thus argues that resolving the proof of claim would not resolve its

counterclaim.  This distinction is without merit.  Indeed, the crux of Sundale's case theory is that none of the money FACE transferred to Sundale was ever intended to be a loan, but rather the first of many payments Mr. Chambers was to make to the Scutieri family to satisfy a $420,000,000 debt.  Sundale relied on this theory to advance numerous affirmative defenses against FACE's proof of claim and as the premise for its recoupment (and declaratory judgment) counterclaims.  All of the affirmative defenses and the counterclaims thus have one common thread -- whether both the money FACE transferred to Sundale and the money that Sundale later transferred back to FACE was premised on a loan by FACE (FACE's version) or a repayment by FACE (Sundale's version).  As a result, a rejection of Sundale's version of the events as defenses to FACE's claims also undermines Sundale's counterclaims.  Similarly, a finding in favor of Sundale on its defenses to FACE's claims would necessarily result in a favorable ruling for Sundale on its  counterclaims.  Either way, a resolution of the proof of claim necessarily resolves the recoupment and declaratory judgment counterclaims.

Sundale also seems to suggest that under Stern, a bankruptcy court only has jurisdiction to enter final judgment on federal bankruptcy law claims -- and no state law claims.  However, the Supreme Court made no such distinction.  Under the clear language of the decision, the Supreme Court held that bankruptcy courts

10

lack "the constitutional authority to enter a final judgment on a state law counterclaim <u>that is not resolved in the process of ruling on a creditor's proof of claim</u>." 131 S.Ct. at 2620 (emphasis added). Because the underlined phrase is included, it must follow that a bankruptcy court would have jurisdiction to enter final judgment on state law counterclaims that are necessarily resolved in the process of ruling on a creditor's proof of claim. <u>See also</u> <u>id.</u> at 2618 (bankruptcy court jurisdiction to enter final judgment exists if "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").

In short, because Sundale's counterclaims are necessarily resolved by resolution of FACE's proof of claim, the self-declared narrow holding in <u>Stern</u> is distinguishable from the facts before us. Therefore, we agree with the district court that the bankruptcy court had jurisdiction to enter a final judgment in this case.

We also find no merit to Sundale's argument that the bankruptcy court erred in applying Florida law. As for Sundale's claim that the bankruptcy court misinterpreted Florida law by holding that Sundale could not have reasonably relied on FACE's misrepresentations because they were made in an adversarial context, the lower court relied on binding Eleventh Circuit case law, in the Florida

11

law context, which concluded that "plaintiffs were unjustified in relying on representations made by the defendants" since, among other things, "the parties had been in an adversarial relationship since well before the execution of the Agreement." Mergens v. Dreyfoos, 166 F.3d 1114, 1118 (11th Cir. 1999). Moreover, all of the Florida state cases Sundale cites seem to rest on the principle that one party had no notice that the other party could not be believed. See, e.g., Greene v. Kolpac Builders, Inc., 549 So. 2d 1150, 1152 (Fla. 3d App. Dist. 1989) (allowing a misrepresentation claim "[a]bsent circumstances which would have put Greene on notice that Kolpak's word could not be believed"); Schlapper v. Maurer, 687 So. 2d 982, 984 (Fla. 5th App. Dist. 1997) (a lawyer's "professional responsibility owed to the court and the opposing parties imposed on him an obligation not to lie about or misrepresent facts critical to the case" (emphasis removed)). Given the history of the parties in this case, it cannot be said that Sundale had no notice of Mr. Chambers's dealings with them. Thus, the lower court did not misapply the Florida law of misrepresentation.

As for Sundale's claim that the bankruptcy court's analysis of duress improperly relied on its speculative finding that Sundale could have obtained funds by mortgaging the undeveloped adjacent property, the bankruptcy court relied on various other factors in reaching the conclusion that Sundale was not

12

under financial duress.  Moreover, the bankruptcy court relied on record evidence to find that the undeveloped adjacent property was unencumbered, and Sundale fails to offer anything more than speculation to suggest that it could not have obtained a mortgage on that property at the time of the alleged duress as it did a year later.

As for Sundale's claim that the bankruptcy court erred in finding that the debtors could not prove misrepresentations relating to the 1999 transactions based on the execution of the 2001 documents, as well as its claim that the bankruptcy court's conclusion that FACE was entitled to seek subordination was circular, Sundale cites no case law or legal argument for these issues in his brief and therefore has waived them.  See Fed. R.App. P. 28(a)(9)(A) (providing that an appellant's brief must set forth his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); Continental Tech. Servs., Inc., v. Rockwell Int'l Corp., 927 F.2d 1198, 1199 (11th Cir. 1991).  Further, because there was no error in the rulings on duress and misrepresentation, these arguments fail.

Finally, Sundale claims that the bankruptcy court erred in concluding that the notes payable to FACE and mortgages in FACE's favor were enforceable, because, it says, Sundale received no consideration from FACE.  As an initial

13

matter, Sundale does not dispute that FACE's subordination in 2001 of its security interest in the Sundale property to Ocean Bank's security interest constituted consideration.  Sundale argues, nonetheless, that FACE's earlier "loans" to Sundale did not constitute consideration because the money came from Mr. Chambers's trusts or other sources, rather than from FACE itself.  However, Sundale admits that some of these earlier transfers were in fact made in FACE's name, see Blue Br. at 5, and cites nothing for the proposition that these transfers could not be considered valid consideration from FACE.

**AFFIRMED.**

14