[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15786
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cv-23384-FAM,
Bkcy No. 1:14-bkc-01475-RAM

In Re: CARIBBEAN FUELS AMERICA, INC,

Debtor.
_____

JONATHAN MCHENRY,

Plaintiff - Appellant,

versus

DREW M. DILLWORTH,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 22, 2017)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Jonathan McHenry—the former landlord of a bankrupt entity and its principals—appeals the bankruptcy court's entry of judgment against him, after a bench trial, for $74,375. The bankruptcy court determined that McHenry received those funds as a result of a series of constructively fraudulent transfers by debtor Caribbean Fuels America, Inc. ("C-Fuels"). In doing so, the bankruptcy court concluded that C-Fuels did not receive "reasonably equivalent value" under 11 U.S.C. § 548 for monetary transfers made to McHenry under the lease of a house used as both a residence and a home office by C-Fuels's principals. On appeal, we agree with McHenry that the bankruptcy court applied the incorrect legal standard in assessing whether C-Fuels received "reasonably equivalent value" for its payments. Applying the correct standard, the record before the bankruptcy court contained no evidence from which the court reasonably could have concluded that C-Fuels did not receive "reasonably equivalent value" for its payments to McHenry. We therefore reverse the bankruptcy court's judgment.

## I. BACKGROUND

In July 2010, McHenry entered into a written one-year lease agreement with co-tenants C-Fuels and its principals, Denis and Stephanie Beauvarlet, for a 6,500 square foot home in Miami, Florida. C-Fuels provided fuel to ships in port. When a ship needed fuel, a crew member would contact C-Fuels, which would then get a price from a fuel supplier and make an offer to the ship to provide fuel at a

particular rate. McHenry had no relationship with C-Fuels or the Beauvarlets before entering into the lease. The lease required an up-front payment of $17,000 for a security deposit and the first month's rent, followed by monthly rent payments of $8,500. Once the lease expired, it remained effective on a month-to-month basis until May 2012.

According to Denis Beauvarlet, the president of C-Fuels, he rented the home because it served the needs of both C-Fuels and his family. He explained that C-Fuels was a "24/7 business," requiring sudden, unexpected work when ships called, even on nights, weekends, and holidays. Trial Tr., Doc. 6 at 130-31.[1] The Beauvarlets therefore set up an office for C-Fuels in the master suite of the house. Stephanie Beauvarlet did salaried accounting and administrative work for C-Fuels predominantly at the home. In addition, the Beauvarlets used the home to entertain C-Fuels's business associates. The lease noted, however, that the house "shall be occupied only by Tenant and Tenant's immediate family consisting of two (2) adults and three (3) children, and guests of Tenant for residential purposes only." Lease, Doc. 20-1 at 250. And C-Fuels maintained a separate commercial office where Denis and other C-Fuels employees worked.

The Beauvarlets determined that they individually would pay for 75% of the rent on the home, while C-Fuels would pay the remaining 25%. Denis Beauvarlet

---

[1] Citations to "Doc. __" refer to numbered docket entries in the district court record in this case.

3

decided that this split was appropriate after speaking to his accountant. Most months, the Beauvarlets transferred $6,375 to C-Fuels—representing 75% of the money owed under the lease—and C-Fuels would then pay the full $8,500 in rent to McHenry. Financial records indicated that C-Fuels paid the initial $17,000 due under the lease as well as the first two $8,500 monthly payments without any identified reimbursement from the Beauvarlets. In total, C-Fuels transferred funds to McHenry 22 times—an initial payment of $17,000 unreimbursed by the Beauvarlets, two monthly $8,500 payments unreimbursed by the Beauvarlets, and 19 $8,500 monthly payments that were 75% reimbursed by the Beauvarlets.

Shortly after the lease ultimately terminated in May 2012, C-Fuels filed for Chapter 7 bankruptcy. Drew Dillworth, the bankruptcy trustee, then filed an adversary proceeding against McHenry in the bankruptcy court seeking to recover the money paid to McHenry by C-Fuels under 11 U.S.C. §§ 544, 547, 548, and 550. Specifically, the trustee's complaint alleged that the transfers to McHenry were actually and constructively fraudulent and therefore should be avoided under 11 U.S.C. §§ 548(a)(1)(A) and (B). The case proceeded to a trial, where Dillworth conceded that the monthly rent for the property was reasonable, but nonetheless argued that C-Fuels's payments to McHenry were intended to defraud C-Fuels's creditors and that the payments should in any event be avoided because C-Fuels derived no value from the lease. After the trial, the bankruptcy court found that the

4

transfers were not the product of actual fraud as defined by 11 U.S.C. § 548(a)(1)(A). Even so, the bankruptcy court found that the transfers were constructively fraudulent under 11 U.S.C. § 548(a)(1)(B) because C-Fuels was insolvent at the time the transfers were made, and C-Fuels did not receive reasonably equivalent value in exchange for its payments to McHenry.

In determining that C-Fuels did not receive "reasonably equivalent value" for its payments to McHenry, the bankruptcy court explained that the joint tenancy of the house yielded little value to C-Fuels. The court noted that because C-Fuels also operated from a separate commercial location and because the lease limited use of the home to residential purposes, C-Fuels did not receive value from the house that was reasonably equivalent to the payments it made to McHenry. Although the court found that the transfers were constructively fraudulent, it accepted McHenry's partial "earmarking" defense, concluding that the total amount avoided should be offset by the total amount of the monthly reimbursement payments made from the Beauvarlets to C-Fuels. Consequently, the bankruptcy court determined that McHenry was obligated to pay the trustee $74,375, consisting of C-Fuels's three initial wholly unreimbursed payments and the unreimbursed portions of the 19 subsequent monthly payments.

McHenry appealed to the district court, arguing that C-Fuels received reasonably equivalent value for its transfers to McHenry because it received a

leasehold interest on a home at a fair rate. Alternatively, McHenry argued that the bankruptcy court improperly weighed record evidence in determining that C-Fuels received insufficient indirect benefits from the lease to constitute reasonably equivalent value. The district court rejected McHenry's arguments and affirmed the bankruptcy court.[2] McHenry now appeals to this court.

## II.    STANDARD OF REVIEW

"We review the district court's decision to affirm the bankruptcy court *de novo*, which allows us to assess the bankruptcy court's judgment anew, employing the same standard of review the district court itself used." *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). "Thus, we review the bankruptcy court's factual findings for clear error, and its legal conclusions *de novo*." *Id.* "The factual findings of the bankruptcy court are not clearly erroneous unless, in the light of all the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re TOUSA, Inc.*, 680 F.3d 1298, 1310 (11th Cir. 2012) (internal quotation marks omitted).

---

[2] McHenry also argued in the district court, and he argues again here, that the bankruptcy court was required to add Denis Beauvarlet as a necessary party to the adversary proceeding. The district court found that McHenry waived this argument because although he raised an affirmative defense that Denis Beauvarlet was a necessary party, he never filed a motion requiring the bankruptcy court to determine whether Beauvarlet was actually a necessary party. Because we conclude that C-Fuels's payments to McHenry should not have been avoided, we need not decide this issue.

## III.   DISCUSSION

Under 11 U.S.C. § 548(a)(1)(B), a bankruptcy trustee

> may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily . . . received less than a *reasonably equivalent value* in exchange for such transfer or obligation; and . . . was insolvent on the date that such transfer was made.

11 U.S.C. § 548(a)(1)(B) (emphasis added).  "'Value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A).

On appeal, McHenry argues that the bankruptcy court applied the incorrect legal standard in determining whether C-Fuels received reasonably equivalent value in exchange for its payments to McHenry.  In McHenry's view, the term "value" in § 548 refers to the market value of the property given to the debtor, as opposed to the benefits the debtor derived from the property.  In the alternative, McHenry argues that the bankruptcy court improperly concluded that C-Fuels did not receive subjective benefits reasonably equivalent to the amount it paid under the lease.  We agree with McHenry that the bankruptcy court applied the incorrect legal standard, and that under the appropriate standard, the bankruptcy court should have entered judgment for McHenry.

7

In *In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1331–33

(11th Cir. 2002), we explicitly answered the question of whether value under § 548

is measured by the objective value of the property received by the debtor or by the

subjective benefits the debtor derived from the property.  In *Federated Title*, a

bankruptcy trustee attempted to avoid transfers made to an individual who had

provided services to the debtor, which had operated a Ponzi scheme.  *Id.* at 1331.

The bankruptcy court and the district court both concluded that the individual

could not have provided "value" to the debtor because any services that furthered a

Ponzi scheme necessarily rendered the entity conducting the Ponzi scheme more

insolvent.  *Id.*

We explicitly rejected that view, instead adopting the reasoning of *In re*

*Universal Clearing House Co.*, 60 B.R. 985 (D. Utah 1986):

> The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. . . . [B]y the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received.  The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme.  In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances. . . . We conclude that a determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.

8

*Federated Title*, 309 F.3d at 1332 (quoting *Universal Clearing House*, 60 B.R. at 998–1000).  Thus, under § 548, in assessing the "value" of property, goods, or services provided directly to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or services provided had objective value.  *See also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994) (noting that outside the foreclosure context, "reasonably equivalent value . . . ordinarily [carries] a meaning similar to fair market value" (internal quotation marks and parentheses omitted)).

Here, the bankruptcy court focused *exclusively* on "the impact that the goods and services had on the bankrupt enterprise." *Federated Title*, 309 F.3d at 1332 (quoting *Universal Clearing House*, 60 B.R. at 1000).  Instead of assessing whether the property leased to C-Fuels had objective value reasonably equivalent to what C-Fuels paid McHenry, the bankruptcy court determined that C-Fuels did not subjectively benefit from the lease.[3]  This was error.  The bankruptcy court

---

[3] The bankruptcy court nominally applied a multi-factor test—employed in a number of previous cases in the bankruptcy and district courts of this Circuit—to determine whether C-Fuels received reasonably equivalent value for its payments to McHenry.  This test considers "the good faith of the parties, the disparity between the fair value of the property [transferred from the debtor to a third party] and what the debtor actually received, and whether the transaction was at arm's length." *In re Leneve*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006).  This framework may apply where the purported benefits to the debtor are indirect. But in cases like this one, where the debtor directly received property, goods, or services as a result of the transfers at issue, that test cannot be squared with *Federated Title*'s demand that "value" be

9

should have entered judgment for McHenry, as the trustee conceded that he was not challenging the objective value of the lease:

> The Court:  You are not contesting the reasonableness of the monthly rent for the residential property.
>
> [Counsel for Dillworth]:  No.

Trial Tr., Doc. 6 at 83–84.  Moreover, "[t]he burden of proving lack of 'reasonably equivalent value' . . . rests on the trustee challenging the transfer." *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593–94 (11th Cir. 1990).  The record before the bankruptcy court contained no evidence from which the court reasonably could have concluded that the objective value of the leasehold interest received by C-Fuels was not reasonably equivalent to the amount transferred to McHenry.  The bankruptcy court therefore should have entered judgment for McHenry.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the judgment of the bankruptcy court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

measured by the objective "value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *Federated Title*, 309 F.3d at 1332.

10