**In re Maurice Michael TYLER, II, Debtor.**

**Maurice Michael Tyler, II, Plaintiff,**

**v.**

**Bruce Banks d/b/a Excelsior Property Holdings, LLC, Casa De Belli Enterprises, L.L.C., and BSD Resources, LLC, Defendants.**

Bankruptcy No. 12–79100–JRS.
Adversary No. 12–05632–JRS.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

June 6, 2013.

E.L. Clark, Clark and Washington, P.C., Atlanta, GA, for Debtor.

## ORDER

JAMES R. SACCA, Bankruptcy Judge.

This case involves the foreclosure sale of the Debtor's home for a price that the Debtor contends represented pennies on the dollar. The Debtor commenced this adversary proceeding seeking to avoid the transaction as a fraudulent transfer for less than reasonably equivalent value pursuant to § 548 of the Bankruptcy Code. Now before the Court is the Debtor's Motion for Summary Judgment. [Doc. 10]. The Defendants filed a response [Doc. 16] but have not filed a cross-motion for summary judgment. The Debtor did not file a reply to the Defendants' response.

### Summary Judgment Standard

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court "should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir. 1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, he must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of his claim on that legal issue. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). He must support his motion with credible evidence that would entitle him to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, he is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of material fact. *Id.*

### Factual Background

Keeping the above standard in mind, the Court lays out the following facts based on the parties' submissions. On March 30, 2012, the Debtor borrowed $15,450.00 (the "Loan") from Excelsior Property Holdings, LLC ("Excelsior") and executed a

Security Deed and Agreement, which authorized Excelsior to foreclose on the Debtor's home if he were to default on the Loan. (Pl.'s Statement of Material Facts ("SMF") Ex. A [Doc. 11 at 6–10] ). Under the terms of the Agreement, the Debtor was to repay the Loan in full on or before September 30, 2012. (Tyler Aff. [Doc. 11 at 15] ). Unable to do so, the Debtor defaulted as of that date. *Id.* Excelsior quickly moved to foreclose on the Debtor's home, selling it at a foreclosure sale just over a month later, on November 6, 2012. *Id.* Purportedly on behalf of Excelsior Property Holdings, LLC and representing himself as its Manager, Bruce Banks executed a Deed Under Power dated November 6, 2012 (the day of the foreclosure sale). (Smith Aff. Ex. 2 [Doc. 16–2 at 9–10] ).

The parties dispute what entity in fact bought Debtor's home at this foreclosure sale. According to the Defendants,[1] BSD Resources, LLC ("BSD") purchased the home. (Smith Aff. ¶ 3 [Doc. 16–2 at 2] ). According to Ian Smith (who appears to be the principal of BSD), he announced the highest bid of $15,500.00 at the foreclosure sale on behalf of BSD. (Smith Aff. ¶ 3 [Doc. 16–2 at 2] ). According to the Debtor, Casa De Belli Enterprises, L.L.C. ("Casa") attempted to purchase his home, despite not being formed as a legal entity until after the foreclosure sale. (Pl.'s SMF ¶ 16 [Doc. 11 at 2] ). Ian Smith is the registered agent for both BSD and Casa. (Smith Aff. ¶ 4, 6 [Doc. 16–2 at 2] ).

The Deed Under Power is itself internally contradictory regarding which entity

bought the property, appearing to list both BSD and Casa as grantees. It states that Excelsior "does hereby bargain, sell and convey unto CASA DE BELLI ENTERPRISES, LLC, the following property . . . TO HAVE AND TO HOLD the said described property unto the said BSD RESOURCES, LLC in FEE SIMPLE." (Smith Aff. Ex. 2 [Doc. 16–2 at 9–10] ). Smith asserts that the reason for this discrepancy is that Banks had sent him an earlier draft of the Deed Under Power that referenced only BSD;[2] that he formed Casa on November 11, 2012 and decided to put title in Casa's name; that he received the Deed Under Power from Banks—purportedly in Casa's name—after that date;[3] and that the reference to BSD was simply an error remaining from when the Deed Under Power was revised from BSD to Casa. (Smith Aff. ¶ 5–9 [Doc. 16–2 at 2–3] ).

On November 24, 2012, the Debtor filed a petition for protection under Chapter 13 of the Bankruptcy Code. A few weeks later, he filed a Complaint commencing this adversary proceeding, which seeks to avoid the foreclosure sale as a fraudulent transfer under 11 U.S.C. § 548. In his Complaint, the Debtor argues that this transaction can and should be avoided because (1) neither Excelsior nor Casa were legal entities in existence at the time the foreclosure sale was consummated, and (2) the transfer was for less than reasonably equivalent value.

The Defendants admit that Excelsior was not legally formed under the laws of Georgia at any time relevant to this pro-

---

1. All of the Defendants here are represented by the same counsel and have made all submissions jointly.

2. The Defendants have submitted what appears to be a copy of this unsigned draft deed. (Smith Aff. Ex. 3 [Doc. 16–2 at 12–13] ).

3. The record is unclear regarding when—under Smith's version of the facts—Banks actually executed the Deed Under Power, if not on November 6, 2012, the date the document reflects it was executed. Smith has simply attested that he *received* the document at least five days later.

ceeding. According to the Defendants, Banks conducted business in Excelsior's name even though he never actually formed it as an LLC. (Def.'s Countercl. ¶ 3). In addition to their timely-filed Answer, the Defendants asserted a "Counterclaim for Reformation," in which they implore the Court to reform the Security Deed (but not the Deed Under Power to change "Excelsior Property Holdings, LLC" to "Bruce Banks d/b/a Excelsior Property Holdings, LLC"). (Def.'s Countercl. ¶ 9). They assert that the Security Deed is contrary to the intent of the parties by mutual mistake and due to a scrivener's error. (Def.'s Countercl. ¶ 6–7). The Debtor denies that there was any mutual mistake or scrivener's error. (Pl.'s Resp. to Countercl. ¶ 4–5).

Also, the Defendants admit that Casa was not a legally formed entity at the time of the foreclosure sale. Casa was not legally organized until November 11, 2012— five days after the foreclosure sale. (Answer ¶ 17). On the other hand, BSD was formed about a year and a half before the foreclosure sale. (Smith Aff. ¶ 4).

As for the value of the Debtor's home, the parties disagree by a wide margin. In support of his motion for summary judgment, the Debtor has submitted a Cobb County property tax bill indicating that, as of October 2012, the county assessed his home's fair market value at $182,540.00, an amount many times greater than the $15,500.00 paid at the foreclosure sale. (Pl.'s SMF Ex. B [Doc. 11 at 12] ). In his affidavit, the Debtor attests that the only other debts secured by his home (beside that owed to Excelsior) were about $4,000.00 of property taxes and $574.00 of

homeowner's association fees. (Tyler Aff. [Doc. 11 at 15] ). On the other hand, the Defendants assert that the Debtor's home was also encumbered by a debt owed to the Cobb Community Development Program in the amount of $53,420.00 and another unspecified loan of approximately $9,000.00. (Smith Aff. ¶ 14 [Doc. 16–2 at 4] ). According to Smith, the Debtor's home also needed about $25,000.00 worth of repairs in order to bring it to a marketable state. (Smith Aff. ¶ 15 [Doc. 16–2 at 4] ). In sum, Smith asserts that his total investment in purchasing Debtor's home, repairing it, and paying off outstanding loans amounted to about $106,920.00. (Smith Aff. ¶ 16 [Doc. 16–2 at 4–5] ). The Defendants have not yet offered any evidence regarding the fair market value of Debtor's home, but object to the evidence the Debtor has offered.[4]

Before proceeding to the merits of the Debtor's Motion for Summary Judgment, the Court must address three threshold issues: (1) Banks' objection to improper service, (2) the Defendants' argument that this Court lacks subject matter jurisdiction to decide this adversary proceeding pursuant to *Stern v. Marshall,* and (3) the Defendants' argument that the Debtor lacks standing under 11 U.S.C. § 548 to bring this fraudulent transfer adversary proceeding.

### Objection to Improper Service on Banks

█ The Defendants object that service upon Bruce Banks d/b/a/ Excelsior Property Holdings LLC was insufficient. (Answer [Doc. 4] at 5). Federal Rule of Bankruptcy Procedure 7004(b)(1) provides that an individual may be served by first class

---

4. The Defendants object to the Debtor's property tax bill as inadmissible hearsay. (Answer ¶ 10). The Court need not rule on this objection because it can take judicial notice of the county's assessment, which is readily available on its website at *http://www.cobbtax.org/*

taxes. *See* Fed.R.Evid. 201(b)(2) (The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.).

U.S. mail at the individual's residence or regular place of business. Fed. R. Bankr.P. 7004(b)(1). This rule does not authorize service to a post office box, however. The Debtor issued a summons on Bruce Banks, addressed to a post office box. [Doc. 2]. Thus service was improper.

■ Under the Federal Rules of Bankruptcy Procedure, if a defendant is not served within 120 days after the complaint is filed, the court "must dismiss the action without prejudice against that defendant *or order that service be made within a specified time.*" Fed. R. Bankr.P. 7004(m) (emphasis added). The court may, at its discretion, direct that service be made within a specified time, even where the plaintiff has not shown good cause for the defective service. *Henderson v. United States,* 517 U.S. 654, 662, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996).

Here, Banks clearly received notice of this adversary proceeding, but he has not yet excused the improper service. If Banks does not waive service,[5] the Debtor must re-issue the summons and properly serve it on Banks within 30 days of the entry of this Order, or Banks will be dismissed from this adversary proceeding without prejudice.

### Stern v. Marshall *and Subject Matter Jurisdiction*

■ Next the Court turns to the Defendants' argument that this Court lacks subject matter jurisdiction to decide this adversary proceeding pursuant to *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), *reh'g denied,* —— U.S. ——, 132 S.Ct. 56, 180 L.Ed.2d 924 (2011). The subject matter jurisdiction of bankruptcy courts is defined by statute. Congress has provided that U.S. district courts have "original and exclusive jurisdiction of all cases under Title 11," *i.e.,* bankruptcy cases. 28 U.S.C. § 1334(a). In addition to jurisdiction over the bankruptcy cases themselves, Congress has granted to the district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Congress has authorized the district courts to refer any of these matters to bankruptcy judges for the district. 28 U.S.C. § 157(a). In this district, the district court has in fact referred all of these matters to the bankruptcy judges for the district. *See* N.D. Ga. R. 83.7A.

■ As extensions of the district courts, bankruptcy courts are thus authorized to hear three categories of civil proceedings ancillary to underlying bankruptcy cases: (1) those *"arising under* title 11," (2) those *"arising in* ... a case under title 11," and (3) those that are *"related to* a case under title 11." 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a); *Stern* at 2603 (2011), *reh'g denied,* —— U.S. ——, 132 S.Ct. 56, 180 L.Ed.2d 924 (2011) (emphasis added). Proceedings "arising under" title 11 involve "matters invoking a substantive right created by the Bankruptcy Code." *Cont'l Nat. Bank of Miami v. Sanchez (In re Toledo),* 170 F.3d 1340, 1345 (11th Cir.1999) (citations omitted). For example, an action by a trustee to avoid a preferential transfer under 11 U.S.C. § 547 would invoke such a substantive right. *Id.* at 1348 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90 (5th Cir. 1987)). Proceedings "arising in" a case under title 11 are generally "administrative-type matters ... that could arise only in bankruptcy." *Id.* at 1345 (quotations

---

**5.** Should the case against Banks be dismissed without prejudice, the Debtor may have an opportunity to re-file and restart the litigation process, since he is well within the statute of limitations.

and citations omitted). Examples of matters that could only arise in a bankruptcy case would be objections to proofs of claims and objections to discharge of particular debts. *Id.* at 1348 (citing Wood).

 The third category—proceedings "related to" a bankruptcy case—is "the minimum for bankruptcy jurisdiction." *Id.* at 1345 (quotations and citations omitted). This category is "extremely broad." *Id.* In determining whether a proceeding is related to a bankruptcy case, the question is whether its outcome "could conceivably have an effect on the estate being administered in bankruptcy." *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.),* 910 F.2d 784, 788 (11th Cir.1990) (*quoting Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir. 1984)). "The proceeding need not necessarily be against the debtor or against the debtor's property." *Id.* (*quoting Pacor*). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* (*quoting Pacor*).

### Core and Non–Core Proceedings

 A separate question from whether a bankruptcy court has subject matter jurisdiction—but one that is often confused with it—is whether the court has constitutional power to enter a final order in a particular proceeding. As explained above, the subject matter jurisdiction of bankruptcy courts is extremely broad. Yet for certain matters, bankruptcy courts do not have authority to enter final orders because they are considered Article I tri-

bunals and not Article III courts.[6] Following the Supreme Court's decision in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)—which held that a bankruptcy court does not have constitutional authority to enter a final order on a purely state-law contract claim—Congress amended the Bankruptcy Code in 1984 by creating two different types of proceedings: "core" and "non-core." *In re Toledo,* 170 F.3d at 1347.

 Congress did not explicitly define "core." So what does it mean to be a "core" proceeding? The simplest way to define an adjective is by looking to the effect it has on the noun it modifies. Congress did provide that in core proceedings, the court may enter final orders and judgments. 28 U.S.C. § 157(b)(1); *Stern,* 131 S.Ct. at 2603. Also, the legislative history indicates that Congress intended for "core" to be interpreted broadly, near or at constitutional limits. *Arnold Print Works v. Apkin (In re Arnold Print Works, Inc.),* 815 F.2d 165, 168 (1st Cir. 1987) (*citing* Cong. Rec. E1108–E1110 (daily ed. March 20, 1984) and *id.* at H1848, H1850 (daily ed. March 21, 1984)). Therefore, the simplest definition of a core proceeding is one in which a bankruptcy court may constitutionally enter final orders and judgments. In non-core proceedings, on the other hand, the bankruptcy court may still hear the matter but must submit proposed findings of fact and conclusions of law to the district court, which then enters a final judgment after considering the proposed findings and conclusions and any objections to them *de novo.* 28 U.S.C. § 157(c)(1).[7]

---

6. Bankruptcy judges are considered Article I—not Article III—judges because they "enjoy neither tenure during good behavior nor salary protection." *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 2601, 180 L.Ed.2d 475

(2011), *reh'g denied,* —— U.S. ——, 132 S.Ct. 56, 180 L.Ed.2d 924 (2011).

7. A bankruptcy court also may enter a final order on a non-core proceeding with a refer-

■ Congress has provided a non-exhaustive list of sixteen purportedly core proceedings in 28 U.S.C. § 157(b)(2). *Stern,* 131 S.Ct. at 2605. But this list has been limited slightly by the Supreme Court's recent decision in *Stern.* The Supreme Court concluded that one category of these listed proceedings—"counterclaims by the estate against persons filing claims against the estate"—is unconstitutionally broad because an action is not in fact a core proceeding when it involves "a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Stern,* 131 S.Ct. at 2622. The high court held that Congress violated the constitutional principle of separation of powers by granting such broad authority to bankruptcy courts to enter final orders in such matters. *Id.* at 2618.

In light of *Stern,* many courts and commentators have concluded that there may be some core proceedings where the bankruptcy court does not have authority to enter a final order. *See, e.g., Kirschner v. Agoglia (In re Refco Inc.),* 461 B.R. 181, 185 (Bankr.S.D.N.Y.2011) (referring to "core but precluded" claims); 1 COLLIER ON BANKRUPTCY ¶ 3.02[7] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[A] determination that the matter is core does not necessarily mean that it can be finally determined by a bankruptcy judge."). But considering the definition of core explained above, to say that there may be core proceedings in which the court may not enter a final order is a contradiction in terms. More accurately—in the words of the *Stern* majority itself—the effect of *Stern* was the "removal of counterclaims such as

[the debtor's] from core bankruptcy jurisdiction." *Stern,* 131 S.Ct. at 2620.

■ The *Stern* majority also explained how the core/non-core dichotomy aligns with the categories of bankruptcy court jurisdiction described above. Core proceedings include both of the first two categories: matters which "*arise in* a bankruptcy case or *under* Title 11." *Stern,* 131 S.Ct. at 2605. (emphasis added). Non-core proceedings are those that fall into the third category of bankruptcy jurisdiction: those that are simply related to the underlying bankruptcy case. *Stern,* 131 S.Ct. at 2605 ("The terms 'non-core' and 'related' are synonymous" (*quoting* COLLIER ON BANKRUPTCY ¶ 3.02[2], p. 3–26, n. 5 (16th ed. 2010))).

**Types of Core Proceedings**

■ As for the first of the two types of core proceedings—matters arising *in* a bankruptcy case—perhaps the best example is a proceeding necessary to rule on a creditor's proof of claim. The Supreme Court has specifically held that a bankruptcy adjudicator [8] has summary jurisdiction over a voidable preference action brought by the bankruptcy trustee against a creditor who has filed a proof of claim. *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). But the Supreme Court clarified in *Stern* that a bankruptcy court is not conferred with core jurisdiction over all state-law counterclaims against a creditor just because the creditor has filed a claim; instead, the counterclaim must necessarily be resolved "in the process of ruling on a creditor's proof of claim." *Stern,* 131 S.Ct. at 2622.

---

ral from the district court and the consent of all the parties. 28 U.S.C. § 157(c)(2). Here, the Defendants have not yet consented to this Court entering any final orders; therefore this provision does not currently apply.

**8.** At the time of the Supreme Court's decision in *Katchen,* Congress had not yet created bankruptcy courts, and the predecessors to today's bankruptcy judges were called referees.

The distinction between those who have filed claims and those who have not was particularly relevant in *Stern* because § 157(b)(2)(c) applies specifically to counterclaims against those who have filed claims.

As for the second type of core proceeding—matters *arising* under the Bankruptcy Code—a preferential transfer avoidance action under 11 U.S.C. § 547 is a good example. No such action exists outside of federal bankruptcy law; Congress created the right for a trustee or debtor-in-possession to assert the right to recover an avoidable preference. The *Stern* Court explained that in contrast to the avoidance action in *Katchen*—a right of recovery created by the Bankruptcy Act of 1898—the debtor's counterclaim in *Stern* was noncore because it was "in no way derived from or dependent upon bankruptcy law; it [was] a state tort action that exist[ed] without regard to any bankruptcy proceeding." *Stern*, 131 S.Ct. at 2618.

### Split on Power to Enter Final Orders in Fraudulent Transfer Cases

Reasonable minds can and do differ regarding whether fraudulent transfer actions are properly characterized as core proceedings arising under the Bankruptcy Code because—although Congress created the right for trustees and debtors-in-possession to avoid these transfers—similar rights already existed under state law. Before *Stern*, "by far the majority of courts" held that bankruptcy courts could enter final orders in fraudulent transfer cases. *In re Refco Inc.*, 461 B.R. 181, 190 (Bankr.S.D.N.Y.2011) (citations omitted). But after *Stern*, some courts have held to the contrary, leading to a split of authority.

This confusion among the courts has arisen primarily because of the sheer complexity of *Stern*'s majority opinion. As Justice Scalia pointed out in his concurring opinion in *Stern*—the majority laid out "at least seven different reasons ... for concluding that an Article III judge was required to adjudicate [that] lawsuit." *Stern*, 131 S.Ct. at 2621 (Scalia, J., concurring). One of these rationales—a comparison to fraudulent transfer claims in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)—has led many courts to conclude that fraudulent transfer proceedings are sufficiently similar to the *Stern* counterclaim such that these proceedings should not be considered core. These courts take a broad view of *Stern*, applying it beyond 28 U.S.C. § 157(b)(2)(C). On the other hand, the *Stern* majority repeatedly emphasized the limited nature of its holding, leading many courts to take a narrow view of the holding, declining to extend it to other matters Congress has characterized as core under 28 U.S.C. § 157(b)(2), such as fraudulent transfer proceedings. One court has characterized the split between the narrow view and the broad view as one that "turns on whether the court applies only the strict dictate of the holding, or rather looks to the thrust of the reasoning the Court used in coming to that holding." *Heller Ehrman LLP v. Arnold & Porter, LLP, (In re Heller Ehrman LLP)*, 464 B.R. 348, 352 (N.D.Cal.2011).

### The Public Rights Exception

Those courts espousing the broad view of *Stern* rely heavily on the majority's discussion of the public rights exception and its analogy to the fraudulent transfer claim in *Granfinanciera*. The public rights exception was discussed at length in the Supreme Court's landmark case on bankruptcy court jurisdiction: *Northern Pipeline*, which did not garner a majority. In *Northern Pipeline*, the plurality held that the state law counterclaims at issue must be adjudicated by an Article III judge because they did not fit into any of

three previously recognized exceptions: territorial courts, military tribunals, and cases involving "public" instead of "private" rights. *Northern Pipeline*, 458 U.S. at 64–67, 102 S.Ct. 2858. To explain the public rights exception, the plurality harked back to the 1856 case of *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1855), the case which first set forth the public rights exception:

> [W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, *involving public rights*, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Northern Pipeline*, 458 U.S. at 67, 102 S.Ct. 2858 (*quoting Murray's Lessee*, 59 U.S. at 284 (emphasis added)). The plurality asserted that this exception extends only to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments ... and only to matters that historically could have been determined exclusively by those departments." *Northern Pipeline*, 458 U.S. at 67–68, 102 S.Ct. 2858 (*citing Crowell v. Benson*, 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932) and *Ex parte Bakelite Corp.*, 279 U.S. 438, 458, 49 S.Ct. 411, 73 L.Ed. 789 (1929)). According to the plurality, "a matter of public rights must at a minimum arise 'between the government

and others.'" *Northern Pipeline*, 458 U.S. at 69, 102 S.Ct. 2858 (*quoting Ex parte Bakelite Corp.*, 279 U.S. at 451, 49 S.Ct. 411). But the plurality added that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power ... may well be a "public right." *Northern Pipeline*, 458 U.S. at 71, 102 S.Ct. 2858.

In his concurring opinion (which Justice O'Connor joined), Justice Rehnquist lamented that the jurisprudence around Article III Courts consisted of "frequently arcane distinctions and confusing precedents" and refused to join in the plurality's designation of "three tidy exceptions." *Northern Pipeline*, 458 U.S. at 91, 102 S.Ct. 2858 (Rehnquist, J., concurring). Justices Rehnquist and O'Connor chose not to adopt the plurality's public rights exception analysis, but did agree that the purely state-law claims at issue did not fall within that exception. *Northern Pipeline*, 458 U.S. at 91, 102 S.Ct. 2858 (Rehnquist, J., concurring) ("To whatever extent different powers granted under [the Bankruptcy Reform] Act might be sustained under the 'public rights' doctrine ... I am satisfied that the adjudication of Northern's lawsuit cannot be so sustained.") (Rehnquist, J., concurring).

After *Northern Pipeline*, the public rights exception became increasingly broad and ambiguous. In *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Supreme Court rejected the *Northern Pipeline* plurality's definition, instead adopting a more flexible standard: "the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced." *Id.*

at 589, 105 S.Ct. 3325 (*quoting Northern Pipeline*, 458 U.S. at 68, 102 S.Ct. 2858). The Court kept with this flexible approach in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), explaining that the question of whether an adjudication by an Article III court is required depends on balancing several factors "with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary." *Id.* at 851, 106 S.Ct. 3245.

The Supreme Court seemed to narrow the exception slightly in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), stating that "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." *Id.* at 54–55, 109 S.Ct. 2782 (citations omitted). And in *Stern*, the majority explained that although jurisprudence involving the public rights exception "has not been entirely consistent, and the exception has been the subject of some debate ... what makes a right "public" rather than private is that the right is integrally related to particular federal government action" and that the debtor's state-law counterclaims in *Stern* "did not fall within any of the various formulations of the concept that appear in this Court's opinions." *Stern*, 131 S.Ct. at 2611–13.

### *Stern's* Reliance on *Granfinanciera*

In *Stern*, one of the rationales the majority employed was that the public rights exception did not apply to the debtor's state-law counterclaim any more than it applied to the similar claim in *Northern Pipeline. Stern*, 131 S.Ct. at 2611. The *Stern* Court also analogized to *Granfinanciera*, in which the Court had held that

parties who had not submitted claims were entitled to a jury trial under the Seventh Amendment because the fraudulent conveyance action against them was "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." *Stern*, 131 S.Ct. at 2614 (*quoting Granfinanciera*, 492 U.S. at 55, 109 S.Ct. 2782). The *Stern* Court pointed to the reasoning in *Granfinanciera*, which explained that "fraudulent conveyance suits were 'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.'" *Stern*, 131 S.Ct. at 2614 (quoting *Granfinanciera*, 492 U.S. at 56, 109 S.Ct. 2782). The *Stern* Court stated that the state-law counterclaim it dealt with—"like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases." *Stern*, 131 S.Ct. at 2614. Thus the *Stern* majority linked the public rights exception analysis under the Seventh Amendment in *Granfinanciera* to the question of authority to enter a final order in *Stern*.

According to courts taking the broad view of *Stern*, the effect of this analogy to *Granfinanciera* is that bankruptcy courts do not have constitutional authority to enter a final order on a fraudulent transfer claim (at least where the defendant has not submitted a claim) because such claims involve private rights that do not fall within the public rights exception. *E.g., Exec. Benefits Ins. Agency, Inc. v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 561 (9th Cir.2012).

On the other hand, as Justice Breyer pointed out in his *Stern* dissent, "[t]he presence of 'private rights' does not auto-

matically determine the outcome of the question" and "non-Article III adjudication of 'private rights' is not necessarily unconstitutional." *Stern*, 131 S.Ct. at 2625 (Breyer, J., dissenting) (*citing Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)). Justice Breyer suggested that there may be other exceptions to the requirement of adjudication by an Article III Court because the *Northern Pipeline* opinion— which identified only three exceptions— garnered only a plurality, not a majority. *Stern*, 131 S.Ct. at 2623–24 (Breyer, J., dissenting).

Courts taking the narrow view of *Stern* point out that the holding in *Granfinanciera* was explicitly limited to the issue of a right to a jury trial under the Seventh Amendment. *In re Appalachian Fuels, LLC*, 472 B.R. 731, 740–41 (E.D.Ky.2012) ("[D]espite the reliance on *Granfinanciera* in *Stern* ... the sole issue in *Granfinanciera* was whether defendants who had not filed a proof of claim against the bankruptcy estate had a Seventh Amendment jury trial right ..."). The *Granfinanciera* Court explained that "we cannot properly reach out and decide matters not before us" and that "[t]he only question we have been called upon to answer in this case is whether the Seventh Amendment grants petitioners a right to a jury trial." *Granfinanciera*, 492 U.S. at 65, 109 S.Ct. 2782. Moreover, the *Granfinanciera* Court suggested that bankruptcy courts may in fact adjudicate fraudulent transfer actions and conduct jury trials, emphasizing that "[w]e are not obliged to decide today whether bankruptcy courts may conduct jury trials in fraudulent conveyance suits." *Granfinanciera*, 492 U.S. at 50, 109 S.Ct. 2782. In fact, the *Granfinanciera* Court conceded that the question of whether fraudulent conveyance avoidance rights under 11 U.S.C. § 548 are properly characterized as public or private rights "admits of some

debate." *Granfinanciera*, 492 U.S. at 55, 109 S.Ct. 2782.

Following *Granfinanciera*, the Courts of Appeal generally held that bankruptcy courts can adjudicate fraudulent conveyance actions. *Gower v. Farmers Home Admin. (In re Davis)*, 899 F.2d 1136, 1141 n. 9 (11th Cir.1990) (explicitly expressing no view on the issue) (citations omitted). Courts taking the narrow view of *Stern* point out that "*Granfinanciera* has been the law for over twenty years, and it was not until after the Court's decision in *Stern* that the bankruptcy court's authority to enter final orders and judgments in fraudulent conveyance or preference actions has been challenged." *Official Comm. of Unsecured Creditors of Appalachian Fuels, LLC v. Energy Coal Resources, Inc. (In re Appalachian Fuels, LLC)*, 472 B.R. 731, 740–41 (E.D.Ky.2012) (*citing In re Safety Harbor Resort & Spa*, 456 B.R. 703, 717 (2011)).

## Narrowness of *Stern* Holding

Aside from the limited nature of the holding in *Granfinanciera*, courts taking the narrow view also point out the *Stern* majority's repeated emphasis on the limited nature of its holding. In his majority opinion, Chief Justice Roberts explained that the question presented there was a "narrow" one; that Congress had violated Article III of the Constitution "in one isolated respect"; and that removal of state law counterclaims that are not resolved in the process of ruling on a creditor's proof of claim from the definition of core does not "meaningfully" change "the division of labor in the current statute." *Stern*, 131 S.Ct. at 2620.

The Eleventh Circuit has recognized that the *Stern* Court "made clear that it did not intend its decision in *Stern* to have broad implications." *In re Sundale, Ltd.*, 499 Fed.Appx. 887, 891 (11th Cir.2012).

According to the Eleventh Circuit, the *Stern* Court's limited holding was that "bankruptcy courts lack 'the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.'" *In re Sundale, Ltd.*, 499 Fed.Appx. at 892–93 (emphasis removed) (*citing Stern*, 131 S.Ct. at 2620). Chief Bankruptcy Judge Collins for the Northern District of Iowa has summed up the reasoning underlying the narrow view well:

> "*Stern* did not strike the entire structure in 28 U.S.C. § 157 allocating the division of authority into core and noncore proceedings. Similarly, *Stern* did not strike down or even address the other enumerated examples of core proceedings in § 157(b)(2)—other than the one it addressed—§ 157(b)(2)(C). [citation omitted]. *Stern* did not even strike down § 157(b)(2)(C) or otherwise state that counterclaims filed by the estate against a person filing claims against the estate are never core proceedings. Instead, *Stern* simply provided guidance on how broadly § 157(b)(2)(C) could reach without exceeding constitutional limits …"

*In re Agriprocessors, Inc.*, 479 B.R. 835, 839–40 (Bankr.N.D.Iowa 2012) (*quoting In re Civic Partners*, 2012 WL 761361, at \*8).

### Narrow View as the Correct View

■ After considering the merits of both the broad view and the narrow view, this Court concludes that the narrow view is the correct view and that this Court thus has authority to enter final orders in fraudulent transfer proceedings, including this one. Had the *Stern* majority intended to make a sweeping proclamation striking down a broad swath of bankruptcy court authority, it would have done so explicitly. Instead, the majority repeatedly emphasized the limited effect of its holding. The

majority's explicit desire for its holding to be construed narrowly is consistent with prior cases in this area of law. *See, e.g., Northern Pipeline*, 458 U.S. at 90, 102 S.Ct. 2858 (Rehnquist, J., concurring) ("Particularly in an area of constitutional law such as that of 'Art. III Courts,' with its frequently arcane distinctions and confusing precedents, rigorous adherence to the principle that this Court should decide no more of a constitutional question than is absolutely necessary accords with both our decided cases and with sound judicial policy.").

Presumably, Chief Justice Roberts' indication of the narrowness of his majority opinion was intentional. According to the Chief Justice, the job of Supreme Court Justices is to "call balls and strikes and not to pitch or bat." Hearing Before the Senate Judiciary Comm. on the Nomination of The Honorable John G. Roberts, U.S.C.J., to be the Chief Justice of the United States, 109th Cong. (Sept. 12, 2005), *available at* http://www.washingtonpost.com/wpdyn/content/article/2005/09/13/AR2005091300693.html (statement of John G. Roberts). Furthermore, Justice Scalia revealed in his concurring opinion that he would have preferred a much broader holding, stating that "in my view an Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary." *Stern*, 131 S.Ct. at 2621 (Scalia, J., concurring). Instead, the majority chose a middle ground between Scalia's view and that of the dissenters: a holding narrowly tailored to the facts of the case. In sum, this Court agrees with the Eight Circuit Bankruptcy Appellate Panel, which stated that "[u]nless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress

in 28 U.S.C. § 157(b)(2) is constitutional." *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (8th Cir. BAP 2012).

Aside from the narrowness of the *Stern* holding, several other factors indicate that bankruptcy judges have constitutional authority to enter a final order in a fraudulent transfer proceeding. For example, even under Justice Scalia's desired heightened requirement for an established historical practice as described in his concurring opinion, a strong argument exists for the constitutionality of final adjudication of fraudulent transfer actions in bankruptcy court. Avoidance and collection of improper pre-petition transfers has been "a core aspect of the administration of bankrupt estates since the 18th century." *Cent. Va. Cmty. College v. Katz,* 546 U.S. 356, 369–70, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (addressing preference avoidance litigation) (citations omitted). Even before Congress created bankruptcy courts, it was "hornbook law prior to 1978 that the authorized judgments and orders of referees, including turnover orders, were final and binding and res judicata unless appealed and overturned." *Northern Pipeline,* 458 U.S. at 102, 102 S.Ct. 2858 (White, J., dissenting). And since the enactment of the modern Bankruptcy Code over three decades ago, "the management and determination of statutory avoidance claims has been a primary function of the bankruptcy courts." *In re Refco Inc.,* 461 B.R. at 188.

Moreover—the narrow holding of *Granfinanciera* notwithstanding—it is entirely possible that fraudulent transfer actions could fit within one of the various formulations of the public rights exception that the Supreme Court has adopted (or may adopt in the future). "Unlike the claim in *Stern* ... fraudulent conveyance claims 'flow from a federal statutory scheme,' ... and are 'completely dependent upon adjudica-tion of a claim provided by federal law,' ... and the asserted authority to decide them is limited to a 'particularized area of law.'" *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),* 467 B.R. 712, 721 (S.D.N.Y.2012) (*citing Thomas,* 473 U.S. at 584–585, 105 S.Ct. 3325 (1985), *Schor,* 478 U.S. 833, 856, 106 S.Ct. 3245 (1986), *Northern Pipeline,* 458 U.S. 50, 85, 102 S.Ct. 2858 (1982), *Stern,* 131 S.Ct. at 2614–15 (Scalia, J., concurring), and *In re Refco, Inc.,* 461 B.R. at 186–87.). In fact, the *Stern* Court pointed out that unlike an avoidance action created by federal law, the state-law counterclaim at issue there was "in no way derived from or dependent upon bankruptcy law; it [was] a state tort action that exists without regard to any bankruptcy proceeding." *Stern,* 131 S.Ct. at 2618.

In reality, the practical consequence of removing fraudulent transfers from core jurisdiction is that our already overburdened district courts would be forced to review every single fraudulent transfer case *de novo,* and resolution of all of these cases will be delayed. Aside from the extra work that would be required of our district courts, due to the "staggering" volume of bankruptcy cases, such a "constitutionally required game of jurisdictional ping-pong between courts would lead to inefficiency, increased cost, delay, and needless additional suffering among those faced with bankruptcy." *Stern,* 131 S.Ct. at 2630 (Breyer, J., dissenting). For all of these reasons, the Court concludes that the fraudulent transfer action here is within this Court's core jurisdiction and authority to enter a final order.

**Court has Subject Matter Jurisdiction**

■ Even if this Court were not to have authority to enter a final order in this proceeding, subject matter jurisdiction exists; thus this Court could in any event propose findings of fact and conclusions of

law to the district court. As explained above, the minimum for bankruptcy court jurisdiction is that the action be related to the bankruptcy case and that it could conceivably have an effect on the estate being administered in bankruptcy. Here, the Debtor's fraudulent transfer claim would clearly have an effect on his bankruptcy estate because if he were to win, the estate would expand and creditors would stand to see a greater payout.

*Stern* reinforces this conclusion. In *Stern*, the majority suggested that bankruptcy courts are not barred from hearing all counterclaims and that they may still propose findings of fact and conclusions of law in those proceedings. *Stern*, 131 S.Ct. at 2620 ("[Respondent] has not argued that the bankruptcy courts are barred from hearing all counterclaims or proposing findings of fact and conclusions of law on these matters, but rather that it must be the district court that finally decides them."). The majority explained that subject matter jurisdiction was not at issue: "Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court" and "[t]hat allocation does not implicate questions of subject matter jurisdiction." *Id.* at 2607. In fact, nothing in *Stern* changes anything regarding whether a bankruptcy court has subject matter jurisdiction to hear a proceeding—only whether that court has constitutional power to enter a final order in it.

Almost every court to consider the matter has come to the same conclusion. *See Cifelli v. Blue Star Residential, LLC (In re Miles)*, 477 B.R. 266, 271 (Bankr. N.D.Ga.2012) ("[T]he idea that *Stern* has left a category of claims—core proceedings not subject to constitutional decision by the bankruptcy court—in 'limbo' and fit only for dismissal, has been generally rejected.") (citation omitted); *see also Sam-*

*son v. Blixseth (In re Blixseth)*, 09–60452–7, 2011 WL 3274042 (Bankr.D.Mont. Aug. 1, 2011) *order amended on denial of reconsideration*, 463 B.R. 896 (Bankr.D.Mont. 2012) (holding that court lacked subject matter jurisdiction, then reversing itself on a motion for reconsideration). Therefore, this Court's jurisdiction to hear this case and—at a minimum—submit findings of fact and conclusions of law to the district court is well-settled.

### Debtor's Standing under Section 548

Now the Court turns to the Defendants' next argument, which is that the Debtor does not have standing to bring this action because only the Trustee can bring it. Courts are split regarding whether Chapter 13 debtors may bring fraudulent transfer actions under 11 U.S.C. § 548 or whether the Chapter 13 trustee must bring the action on behalf of the estate. Most courts require the trustee to assert the right to avoid fraudulent transfers in Chapter 13 cases, while other courts permit the debtor to bring the action alone. 5 COLLIER ON BANKRUPTCY ¶ 548.02[1][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Courts that hold that debtors do not have standing to bring a fraudulent transfer action rely primarily on the text of § 548, which provides that "[t]he *trustee* may avoid any [fraudulent] transfer." 11 U.S.C. § 548 (emphasis added); *Davis v. Victor Warren Properties, Inc. (In re Davis)*, 216 B.R. 898, 903 (Bankr.N.D.Ga. 1997) ("Section 548 empowers only a trustee to avoid a fraudulent transfer and does not give a Chapter 13 debtor standing to bring a fraudulent conveyance action."). These courts reason that because Congress did not specifically grant Chapter 13 debtors the power to bring fraudulent transfer actions—as it did for debtors-in-possession under other chapters—they are precluded from doing so. *See, e.g., In re*

*Binghi,* 299 B.R. 300 (Bankr.S.D.N.Y. 2003). ("Unlike Sections 1107 and 1203, applicable to Chapter 11 and 12 debtors in possession, Section 1303 of the Code, governing the rights and powers of a Chapter 13 debtor, does not include among the powers conferred a grant of authority to Chapter 13 debtors to exercise a trustee's Chapter 5 avoidance powers.").

On the other hand, courts taking the contrary position reason that "the designation in § 1303 of certain powers that debtors hold exclusive of the trustee does not mean that there are no other powers that the debtor holds concurrently with the trustee." *Houston v. Eiler (In re Cohen),* 305 B.R. 886, 894 (9th Cir. BAP 2004). These courts look to the legislative history behind § 1303, which indicates that this list of exclusive powers "does not imply that the debtor does not also possess other powers concurrently with the trustee." 124 Cong. Rec. H. 11106 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); S17423 (daily ed. Oct 6, 1978) (remarks of Sen. DeConcini).

Supporting the latter view is the position of the Eleventh Circuit—and all other circuits that have considered the issue—that a Chapter 13 debtor may pursue a non-bankruptcy suit on behalf of the estate. *See Crosby v. Monroe Cnty.,* 394 F.3d 1328, 1331 n. 2 (11th Cir.2004) ("In Chapter 13 cases where the debtor is the party plaintiff, courts recognize that the Chapter 13 debtor may sue and be sued, and that the debtor controls the litigation as well as the terms of the settlement.") (punctuation and citations omitted); *Wilson v. Dollar Gen. Corp.,* 717 F.3d 337, 12–1573, 2013 WL 2130939 at *5 (4th Cir. May 17, 2013) ("All of the five circuit courts to have considered the question have concluded that Chapter 13 debtors have standing to bring causes of action in their own name on behalf of the estate."). These courts recognize the practical differences between a debtor under Chapter 7 and a debtor under Chapter 13 and conclude that "unlike a Chapter 7 debtor, a Chapter 13 debtor possesses standing—concurrent with that of the trustee—to maintain a non-bankruptcy cause of action on behalf of the estate." *Wilson,* 2013 WL 2130939 at *5; *see also In re Goines,* 465 B.R. 704, 706 (Bankr.N.D.Ga.2012) (finding that the word "trustee" in § 327(e), which authorizes the "trustee" to employ special counsel, includes a Chapter 13 debtor-in-possession).

■■■ In any event, the Court need not resolve the split in authority over the Debtor's standing under § 548 because he has explicit statutory authority to bring this action pursuant to § 522(h):

> "The debtor may avoid a transfer of property of the debtor ... to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if ... such transfer is avoidable by the trustee under section ... 548."

11 U.S.C. § 522(h); *see also Ryker v. Current (In re Ryker),* 301 B.R. 156, 160 (D.N.J.2003) ("[A] Chapter 13 debtor undoubtedly does have standing to initiate an avoidance action when the property to be reclaimed or recaptured is exempt from execution.... That a Chapter 13 debtor may commence a § 548 avoidance action pursuant to § 522(h) is beyond dispute."); *see also Houston v. Eiler (In re Cohen),* 305 B.R. 886, 892 (9th Cir. BAP 2004) ("[T]he debtor can attack a $1 million avoidable transfer under § 522(h) but only if there is some amount of the recovery— even $1.00—that the debtor can exempt."). Here, the Debtor can exempt a portion of the value of his home; thus he has standing under § 522(h) to bring a § 548 fraudulent transfer action.

The Defendants argue that § 522(h) is inapplicable because the Debtor waived his homestead exemption in the Loan Agreement. Although § 522(e) provides that a "waiver of an exemption executed in favor of a creditor that holds an unsecured claim against the debtor is unenforceable," the Defendants contend that this subsection does not apply to them because Excelsior was a secured, not unsecured, creditor. However, the Defendants appear to have overlooked the very next sentence in § 522(e), which provides that a "waiver by the debtor of a power under subsection ... (h) of this section to avoid a transfer ... is unenforceable in a case under this title." 11 U.S.C. § 522(e). Accordingly, the Debtor could not have waived his right to bring this § 548 fraudulent transfer action pursuant to § 522(h).

### The Merits of the Debtor's Motion for Summary Judgment

■ Having dealt with the Defendants' objections to service, the Court's authority, and the Debtor's standing, the Court now proceeds to the merits of the Debtor's Motion for Summary Judgment. The Debtor argues that the foreclosure sale of his home did not comply with Georgia law and can and should be avoided pursuant to § 548(a)(1)(B) because this transfer was made "within 2 years before the date of the filing of the petition" and "the debtor ... involuntarily ... received less than a reasonably equivalent value in exchange for such transfer ... and ... became insolvent as a result of such transfer." 11 U.S.C. § 548(a)(1)(B). The parties do not appear to dispute that the transfer—made less than 20 days before the Debtor filed his bankruptcy petition—was within the statute of limitations, nor that it rendered him insolvent. The only disputes appear to be over whether the Debtor received reasonably equivalent value in exchange for the sale of his home and whether the foreclosure sale complied with Georgia law.

■ In the context of a § 548 claim involving a foreclosure sale, the Supreme Court has held that the price received at a non-collusive foreclosure sale conclusively establishes "reasonably equivalent value" of the mortgaged property, "so long as all the requirements of the State's foreclosure law have been complied with." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). However, "[a]ny irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale price of its conclusive force." *BFP*, 511 U.S. at 545–46, 114 S.Ct. 1757. In such a case, "the transfer may be avoided if the price received was not reasonably equivalent to the property's actual value at the time of the sale." *BFP*, 511 U.S. at 546, 114 S.Ct. 1757.

■ The Debtor argues that the *BFP* presumption does not apply—and the Court thus should determine whether the Debtor received reasonably equivalent value for his home—because neither Excelsior nor Casa were legal entities at the time of the foreclosure sale. Generally, Georgia law requires that in order for a deed to effectively convey property, both the grantor and the grantee must be legal entities at the time of the conveyance. *See* 2 PINDAR'S GA. REAL ESTATE LAW & PROCEDURE § 19:17 (7TH ED.). *Cox v. Pearson,* 212 Ga. 294, 92 S.E.2d 25 (1956) (holding that deed was prima facie void because it was not shown to be that of a "natural person, a corporation, or a quasi person or entity, such as a partnership," and "[t]he law recognizes no other owners of property") (*citing Miller v. Brooks,* 120 Ga. 232, 234, 47 S.E. 646, 647 (1904) and *McCollum v. Loveless,* 185 Ga. 748, 196 S.E. 430 (1938)). As for Excelsior, the Defendants

concede that it was never formed as a legal entity, but argue that the Debtor is estopped from attacking its validity under the doctrine of corporation by estoppel and that Excelsior was simply a trade name Banks sometimes used. As for Casa, the Defendants assert that BSD, which was a valid corporation at the time of the sale, and not Casa, was the purchaser at the foreclosure sale and that Casa's legal status on the day of the sale is irrelevant. Debtor disputes that BSD was the purchaser at the sale because the Deed Under Power recites that Casa was the purchaser.[9] Thus a question of fact remains regarding which entity was the actual grantee, that is the actual purchaser at the sale. Consequently, the Motion for Summary Judgment must be denied.

### Conclusion

Questions of fact remain regarding whether the foreclosure sale was valid under Georgia law and whether reasonably equivalent value was given. The Debtor has not conclusively established that the *BFP* presumption does not apply here; thus the Court cannot find as a matter of law in favor of Debtor that the sale did not comply with Georgia law or that the value received for his home was not reasonably equivalent to its actual value.

For the above reasons, it is hereby

ORDERED that the Debtor has 30 days after the entry of this Order in which to re-issue a summons and complete service on Banks or secure a written waiver from him and file it with the Court; it is further

ORDERED that if the Debtor fails to serve Banks or obtain a written waiver from him and file it with the Court within 30 days after the entry of this Order, the Court will enter an order dismissing Banks from this adversary proceeding without prejudice; it is further

ORDERED that Banks will have 30 days after re-issuance of the summons in which to file an answer in this adversary proceeding, though he will not required to do so.[10] It is further

ORDERED that the Debtor's Motion for Summary Judgment is DENIED.

---

**9.** The record reflects only one Deed Under Power, which deed does not show a transfer of Debtor's home from BSD to Casa.

**10.** If Banks were to contend that the subsequent service was still defective, he would need to file another Answer raising that defense.